527 F.2d 1061
 In the Matter of YORK INTERNATIONAL BUILDING, INC., Debtor.
YORK INTERNATIONAL BUILDING, INC., Debtor, and Dr. Richard
You, Stockholder, Appellants,
v.
Aaron M. CHANEY, Trustee, Appellee.
YORK INTERNATIONAL BUILDING, INC., Bankrupt, and Dr. Richard
You, Stockholder, Appellants,
v.
Aaron M. CHANEY, Trustee, et al., Appellees.
 Nos. 74--1722, 74-1723.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 23, 1975.
Rehearings and Rehearings In Banc
Denied Jan. 19, 1976.
 
 Helen B. Ryan (argued), of Honolulu, Hawaii, for appellants.
 H. William Burgess (argued), Honolulu, Hawaii, and Thomas P. Huber (argued), Honolulu, Hawaii, for appellees.
 J. Ronald Trost and Marc A. Levinson of Shutan & Trost, Los Angeles, Cal., for H. William Burgess and Aaron M. Chaney on Petitions for Rehearing.
 OPINION
 Before BARNES, KILKENNY and GOODWIN, Circuit Judges.
 KILKENNY, Circuit Judge:
 
 
 1
 Before us are appeals by a bankrupt corporation and its stockholder from orders of the district court (1) adjudging the corporation bankrupt, appointing a trustee, and authorizing distribution of all assets in complete liquidation, and (2) approving and directing the payment of certain administrative fees and expenses in the Chapter X bankruptcy proceeding.
 
 
 2
 The principal characters in the drama before us are:
 
 Appellants:
 
 3
 York International Building, Inc. (York)--debtor and bankrupt;
 
 
 4
 Dr. Richard You (You)--debtor's stockholder.
 
 Appellees:
 
 5
 Aaron M. Chaney (Trustee)--former trustee in Chapter X reorganization and present trustee in bankruptcy; H. William Burgess (Burgess)--attorney for trustee;Massachusetts Mutual Life Insurance Company (Mass. Mutual)--principal secured creditor (mortgagee) of debtor, holding the first mortgage on substantially all the fixed assets of debtor;
 
 
 6
 Thomas P. Huber (Huber)--attorney for mortgagee;
 
 
 7
 Edward Y. N. Kim (Kim)--attorney for debtor.
 
 HISTORY OF THE LITIGATION
 
 8
 In June, 1968, Mass. Mutual initiated a mortgage foreclosure proceeding against York in the Hawaii state courts. In September, 1968, corporate reorganization proceedings were commenced under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq., staying action on the foreclosure claim. The district court appointed Chaney as trustee in reorganization.
 
 
 9
 In March, 1973, the district court, on trustee's application, authorized the sale of York's principal asset, a 12-story building and land situated in Honolulu. Appellants appealed the order of sale to this court (No. 73--2209). During the pendency of that appeal, but before its resolution, trustee requested the district court to grant a hearing under 11 U.S.C. § 636(2) to approve an order declaring York a bankrupt, directing the bankruptcy to proceed, authorizing trustee to distribute $5,000.00 to the stockholders in full satisfaction of their interests, authorizing trustee's dissolution of York, and directing the trustee in reorganization to distribute all remaining assets in complete liquidation to meet the claims of York's creditors. Proper notice of the proposed hearing was given to all interested parties. The trustee's notice did not mention the appointment of a trustee in bankruptcy. On February 15, 1974, the district court ordered that the hearing as proposed be set for February 25th. Trustee thereupon moved, in this court, that the district court be granted full authority to proceed on his pending motions in district court, which motion appellants opposed.
 
 
 10
 On February 25, 1974, two coincidental events occurred. This court entered an order in the pending appeal authorizing the trustee's proposed hearing under 11 U.S.C. § 636(2) to proceed as scheduled.[1] The district court record shows that this interlocutory order was filed in that court in Honolulu on February 28th.
 
 
 11
 The district court hearing on trustee's motion proceeded on February 25th. Testimony was heard, inter alia, on York's insolvency and the attempted reorganization's failure. The district court granted all elements of trustee's request, as described above, and then suggested the appointment of a trustee in bankruptcy. Over appellants' objection, the district court named Chaney to fill the position, his name having been placed in nomination by appellee Burgess, trustee's attorney.[2] The district court formalized its action in an order filed on February 26th. This order forms part of the basis of appellants' present appeal.
 
 
 12
 The proceedings were then assigned to the referee in bankruptcy, except for the allowance of administrative expenses in the reorganization phase. A hearing on the issue of administrative expenses was held on March 25, 1974. After a full hearing, the district court made awards to four of appellees (Chaney, Burgess, Mass. Mutual's attorney Thomas P. Huber, and York's attorney Edward Y. N. Kim) as 'reasonable compensation for services rendered in this proceeding,' pursuant to 11 U.S.C. §§ 641, 642. The amounts granted were in addition to previous awards made to appellees for similar services rendered. The specific awards are enumerated and analyzed below.
 
 
 13
 This court disposed of the pending appeal in No. 73--2209 on July 12, 1974, approving the order of sale of the real property.[3]
 
 ISSUES ON APPEAL
 We state the principal issues as follows:
 
 14
 I. Did the district court have jurisdiction over the proceedings when it declared York bankrupt and made ancillary orders notwithstanding the pendency of No. 73--2209 in this court?
 
 
 15
 II. Do appellants have standing to challenge the district court's appointment of the trustee in bankruptcy?
 
 
 16
 III. Did the district court abuse its discretion in its award of administrative expenses to appellees?
 
 THE JURISDICTIONAL ISSUE
 
 17
 Put in its simplest terms, appellants' argument is that on February 25--26, 1974, the district court ordered the bankruptcy without possessing requisite jurisdiction since the entire matter was jurisdictionally vested in this court under appeal No. 73--2209. More specifically, they contend the district court's February 26th order was necessarily dependent upon the outcome of the challenged order of sale in No. 73--2209 and thus inextricably bound with it. They note that an inadequate sale price for the building would render the corporation's finances inadequate to meet both the claims of unsecured creditors and the high administrative costs.
 
 
 18
 However, due to this court's interlocutory order of February 25, 1975, and the happenstance of time, appellants' argument is rendered meritless and we need not further explore its logic. Our February 25th order reinstated in the district court any essential jurisdiction it may have lacked to go forward with the matter of the bankruptcy proceeding. Sumida v. Yumen, 409 F.2d 654, 656--657 (CA9 1969).
 
 
 19
 The parties all concede that the clerk of the district court in Hawaii was notified of our decision by telephone by the clerk of this court on February 25th. This disposes of appellants' claim that the district court nevertheless acted without jurisdiction because it lacked actual notice of such jurisdiction. Additionally, our February 25th Memorandum was in response to a motion and so was not a 'judgment' under Rule 41, FRAP. As such, it took effect immediately upon being filed in this court and did not become subject to any stay of mandate or similar abeyance. The 'judgment' mentioned in Rules 37 and 41, FRAP, is obviously the final judgment on appeal, not an intermediate order, such as we entered on February 25th. Appellants' contention that there was some form of transoceanic suspension of jurisdiction in this case is meritless.
 
 
 20
 In so holding, we, of course, express no opinion on the now hypothetical question of what degree of jurisdiction, if any, the district court would have, had our February 25th order not preceded its own.
 
 APPOINTMENT OF THE TRUSTEE IN BANKRUPTCY
 
 21
 Beyond question the district court was acting within its jurisdictional sphere in closing the Chapter X proceeding, entering the adjudication (reinstatement) in bankruptcy, and appointing the trustee. 11 U.S.C. §§ 636--638. That the district court had jurisdiction over all the Chapter X proceedings is clearly established by the provisions of 11 U.S.C. § 511.
 
 
 22
 However, appellants argue that in appointing appellee Chaney, as trustee in bankruptcy by its order of February 26th, the district court violated the meeting and notice requirements of the Bankruptcy Act. 11 U.S.C. § 638 governs the election or appointment of a trustee in bankruptcy in the context of an attempted Chapter X corporate reorganization, and by its mandate, 11 U.S.C. § 72 controls. That section provides:
 
 
 23
 '(a) The creditors of a bankrupt, exclusive of the bankrupt's relatives or, where the bankruptcy is a corporation, exclusive of its stockholders . . ., shall, at the first meeting of creditors after the adjudication, . . . appoint a trustee . . . of such estate. If the creditors do not appoint a trustee . . . the court shall make the appointment. . . .'
 
 
 24
 Such a creditors' meeting must meet the notice requirements of 11 U.S.C. § 94.
 
 
 25
 Appellants' challenge is defeated, however, by the threshold requirement of standing. The established purpose of the notice and creditors' meeting requirements is to protect creditors, not the bankrupt or the bankrupt's stockholders. Section 44 of the Act expressly excludes the latter from having a voice in the matter. The provisions are designed to prevent the election of a trustee too closely associated with the bankrupt, not to allow the bankrupt to prevent the election of a trustee it finds undesirable, which is apparently being attempted here. See In re Ira Haupt & Co., 240 F.Supp. 10 (S.D.N.Y.1965), affd. 379 F.2d 884 (CA2 1967); 6A Collier on Bankruptcy P12.05(5) (14th ed. 1972).
 
 
 26
 Since appellants had no protectible interest at stake under the notice and creditors' meeting sections, they cannot now challenge any alleged contravention of the statutes. As the Supreme Court recently stated in a different context in Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), this claim '. . . falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.' Id. at 509, 95 S.Ct. at 2210. If a challenge was to be made on the notice and meeting requirements, it was the creditors' right to do so, not appellants'. While we cannot place our stamp of approval on the procedure followed by the district judge, we must conclude that appellants lack standing to object. Since a proper challenge by the genuinely interested parties was not made, the issue cannot now be raised. We express no opinion on what might be the result if a creditor would now challenge the appointment.
 
 
 27
 Because appellants lack standing, we need not reach the merits of their substantive claims, other than the award of fees.
 
 TRUSTEE'S COMPENSATION
 
 28
 Chaney claims for his awards totaling $162,359.14 are fraught with inconsistencies, generally unsupported by the record and wholly unwarranted under the applicable statutes and decisional case law.
 
 
 29
 The statute under which the claims were filed and the awards made is § 241 of the Bankruptcy Act, 11 U.S.C. § 641, providing, in material part, as follows:
 
 
 30
 'The judge may allow . . . reasonable compensation for services rendered . . . in a proceeding under this chapter . . .
 
 
 31
 (3) by the trustee and other officers, and the attorneys for any of them; . . ..'
 
 STANDARDS ON REVIEW
 
 32
 At the outset, we recognize that the district judge in passing on claims for compensation for services in bankruptcy proceedings has a broad discretion and the appellate courts will not interfere with his awards in the absence of a clear abuse of discretion or an erroneous application of the law. Numerous guidelines have been employed by the appellate courts in reviewing district court determinations, including the great public interest which is inherent in all bankruptcy matters. Newton v. Consolidated Gas Co.,259 U.S. 101, 42 S.Ct. 438, 66 L.Ed. 844 (1922); Mass. Mutual Life Ins. Co. v. Brock, 405 F.2d 429 (CA5 1968); Official Creditors Committee of Fox Markets, Inc. v. Ely, 337 F.2d 461 (CA9 1964); Cooke v. Bowersock, 122 F.2d 977 (CA8 1941). The district courts have a duty to examine carefully all claims presented even though no objections have been filed.[4] Moreover, the failure to object does not constitute a test of the value of the service or the compensability of the claim. In re Philadelphia & Reading Coal & Iron Co.,61 F.Supp. 120 (E.D.Pa.1945). Upon review, the appellate courts, like trial courts, are themselves experts on the value of services rendered in a bankruptcy proceeding and are not bound by the evidence offered. Mass. Mutual Life Ins. Co. v. Brock, supra; Campbell v. Green, 112 F.2d 143 (CA5 1940). The absence of an objection to any one or more of the awards does not prevent the courts from exercising their judicial function to insist that the compensation be reasonable. In re Detroit In'l. Bridge Co., 111 F.2d 235 (CA6 1940); In re Kentucky Electric Power Corp., 11 F.Supp. 528 (W.D.Ky. 1935).
 
 THE GUIDELINES[5]
 
 33
 We start with the well established principle that those performing duties in the administration of a bankrupt's estate are not acting as private persons, but as officers of the court. Callaghan v. R.F.C., 297 U.S. 464, 56 S.Ct. 519, 80 L.Ed. 804 (1936) (Trustees); Realty Associates Securities Corp. v. O'Connor, 295 U.S. 295, 55 S.Ct. 663, 79 L.Ed. 1446 (1935) (Referees); Fox Markets, supra (Attorneys); Newton, supra (Masters). Consequently, Chaney and likewise his attorney Burgess, in the performance of their respective duties were public officers and officers of the court. Callaghan, Id., 297 U.S. at 468, 56 S.Ct. 519; Fox Markets, Id., 337 F.2d at 465.
 
 
 34
 A summary of other teachings employed by the courts in arriving at reasonable compensation under § 641 follows:
 
 
 35
 ( a) The legislative history and the language of the statute reflect a congressional policy forbidding the allowance of unreasonable or excessive compensation. Fox Markets, supra, at 465.
 
 
 36
 (b) Extravagant allowance of fees and other costs of administration in bankrupt estates have long been denounced as 'crying evils.' In re Realty Associates Securities Corp. v. O'Connor, supra, at 299, 55 S.Ct. 663.
 
 
 37
 (c) Although the court must fairly treat the trustee and his attorney, one of its fundamental duties is to do equity to the debtor and its creditors. Brock, supra, 405 F.2d at 432, 433.
 
 
 38
 ( d) A court must ever be alert lest a reorganization inure to the benefit, not of the distressed debtor and its creditors, but only to those who are engaged in the administration of the estate. Pennish v. Herz, Inc., 81 F.2d 511 (CA7 1936). This policy of economy applies to all claims presented for services or expenses in connection with the reorganization. Stark v. Woods Bros. Corp., 109 F.2d 969 (CA8 1940).
 
 
 39
 ( e) Because trustees and their attorneys are public officers, the courts have many times considered the salaries prescribed for judicial officers performing similar duties as valuable, although not conclusive, guides in reviewing the reasonableness of awards made for services rendered. Callaghan,supra (Trustees); O'Connor, supra (Referees); Fox Markets, supra (Attorneys); and Newton, supra (Masters). The trustees and their attorneys, being regarded as public servants, should not expect as much for their services in bankruptcy proceedings as they might in private employment. 6 Collier on Bankruptcy § 13.03 at 911 (14th ed. 1972).
 
 
 40
 ( f) In balancing the duty to protect the debtor and its creditors against the right of a trustee and his attorney to reasonable compensation, the courts should look to the success or failure of the reorganization effort. In re Mt. Forest Fur Farms of America, Inc., 157 F.2d 640 (CA6 1946); In the Matter of Yale Express System, Inc., 366 F.Supp. 1376 (S.D.N.Y.1973), and In the Matter of Webb & Knapp, Inc., 363 F.Supp. 423 (S.D.N.Y.1973). Here, the attempted reorganization was a complete failure. The effort has now been reduced to an ordinary bankruptcy proceeding where the creditors are compelled to look forward to additional awards of trustee's and attorney's fees.
 
 
 41
 ( g) Although at least one court, In the Matter of Yale Express System, Inc., supra, is of the opinion that an award on an annual basis is the 'most sensible and appropriate standard to apply to an operating trustee', Id. 366 F.Supp. at 1385 (1973), our circuit, in Fox Markets, placed much greater weight on the amount of time actually spent in performing the services to the estate. The rule there stated is sound. Trustees and other officers of the court in bankruptcy proceedings must keep accurate records of the time expended. Here, as we shall later emphasize, the trustee kept scanty records of his time actually expended. The trustee and his attorney must expect their claims to be closely scrutinized by the debtor, the creditors, and by the court and should be meticulous in keeping accurate accounts of the various items and elements which go to make up their claims. Miller v. Robinson, 378 F.2d 2 (CA9 1967); In re National Accessories, Inc., 13 F.Supp. 278 (D.Neb.1936).
 
 
 42
 ( h) Finally, reasonable compensation for services rendered under Chapter X '. . . necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act.' The claimant must show that the disbursements were '. . . in furtherance of a project exclusively devoted to the interests of those whom the claimant purported to represent.' Woods v. City National Bank & Trust Co. of Chicago, 312 U.S. 262, 264, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941). In other words, a trustee is not permitted to make a profit in violation of his fiduciary obligation regardless of prejudice to the estate. Governor Clinton Co., Inc. v. Knott, 120 F.2d 149 (CA2 1941); Sexton v. Sword S.S. Line, Inc., 118 F.2d 708 (CA2 1941) (§ 77B cases).
 
 ANALYSIS OF CLAIMS
 
 43
 Having thus stated the controlling rules, we proceed to scrutinize Chaney's claims on which the awards were made. At best, they are a hodgepodge of sophistry. At worst, they could be classified as deliberate attempts to obtain excessive compensation by intentionally misleading the court.
 
 
 44
 Chaney's only serious attempt to distinguish the types of service that he performed for the estate was in the hearing on March 25, 1974. In summary, he there split his services into four distinct categories: (1) services in management of the business property, (2) services in leasing and releasing the business propety, (3) brokerage services in securing a purchaser for the business property, and (4) services in his capacity as trustee. In answer to a question by his attorney, Chaney testified that each of the four categories was separate and distinct from the others. The district court's attention was not called to the fact that the statutes under which he was appointed, his order of appointment[6] and subsequent orders required him to perform, as trustee, the functions and duties mentioned in all four categories. Based on Chaney's contention that he was properly wearing at least four hats, the district court received testimony on (1) the customary charges in the private sector for services in collection of rentals, (2) the customary charges in the private sector for leasing or releasing of space in a building, and (3) the customary charges in the private sector for brokerage services in the sale of property. No testimony whatsoever was received on compensation received by public officials performing the same type of duties.
 
 
 45
 The inconsistencies and haphazardness of appellants' claims are evidenced by the orders making the awards. The initial award to Chaney is that of July 24, 1969, authorizing him to pay himself as trustee compensation for building management services in the amount of 5% of the gross monthly rental income from the building commencing July 1, 1969. In the final hearing in connection with the allowance of compensation on March 25, 1974, Chaney testified that the 5%, totaling $65,122.01, was collected for his management services on the building and not in his capacity as trustee. Furthermore, while collection of rents is one of the services for which Chaney claimed compensation as a trustee in his 1970 petition, by March 25, 1974, he changed hats and claimed this was one of the management services for which he collected the 5%. These claims are in direct contravention of the order made on July 24, 1969.
 
 
 46
 On November 4, 1970, Chaney was awarded $12,637.13 for his services as trustee. In his application, he claimed he performed services in (1) objecting to improper claims against debtor and the estate, (2) negotiating the extension of a lease, (3) successful contest of another claim, (4) forcing the cancellation of a certain mortgage, (5) contesting the assessed valuation of the debtor's property, (6) negotiating another lease, (7) negotiation of another lease with another tenant, (8) the collection of delinquent rentals, (9) negotiations with the city council of the City of Honolulu, and (10) the management on a day to day basis of the 12-story office building that constituted the principal asset of the debtor's estate. As of November 4, 1970, it seems quite clear that Chaney was claiming compensation at trustee for collecting rentals and negotiating the extension of leases, making no claim that he was entitled to compensation other than that which might be awarded to him in that capacity. The collection of rentals as trustee in the initial award cannot be reconciled with his later claims that he was collecting rentals in an independent capacity.
 
 
 47
 Next, under the order of April 25, 1972, Chaney was awarded $30,000.00. In the application for this award, Chaney alleged that prior to that date he had not received any compensation for acting as owner of the building in transactions involving creditors, stockholders, interested purchasers, financial analysis, projections and taxation. Chaney claimed compensation for those functions at the rate of $50.00 per hour as trustee and $25.00 an hour for the time of a senior staff member, claiming a total for these services of $22,187.50. He then introduced an item for negotiation of new leases and lease renewals handled by him, totaling $16,961.96, but being big hearted, he rounded out his claim for these services at $30,000.00. These awards were made to Chaney as trustee. At the final hearing on March 25, 1974, Chaney classified his services for management of the property and for leasing and releasing of space in the building as categories entirely outside his services as trustee, again making apparent the duplicity and overreaching in his claims. Chaney had the temerity to make this later claim despite the language of his order of appointment and of 11 U.S.C. § 516(3), which enables the judge to '. . . authorize . . . a trustee . . ., upon such notice as the judge may prescribe and upon cause shown, to lease or sell any property of the debtor, whether real or personal, upon such terms and conditions as the judge may approve.' (Emphasis added.)
 
 
 48
 Finally, we have the order of March 28, 1974, based on the hearing of March 25th of the same year, which awards to Chaney an additional sum of $52,500.00, plus $2,100.00, the gross income tax of the state of Hawaii. This last order creates outright confusion and renders the previous orders practically meaningless. In the application for these awards which were allowed in full by the court, the only showing as to the basis for the claim is paragraph 8, which reads:
 
 
 49
 '8. The reasonable value of the services rendered by your trustee in this proceeding during the last five and one-half years, over and above the amounts of interim compensation which have already been paid is $52,500.00.' (Emphasis added.)
 
 
 50
 There is no showing whatsoever, by testimony, exhibit or otherwise, as to the time Chaney may have expended in his capacity as trustee, or otherwise. When confronted with the fact that his final application for compensation made no reference to services rendered on an hourly basis, Chaney's sole excuse was that it was '. . . personally impossible for me to keep a log of all of the things I did for the York International Building, Inc.'
 
 
 51
 At this hearing, Chaney confined his duties as trustee to negotiation of claims, appearing before the referee in bankruptcy, obtaining adjudications, and 'the biggest services . . . would be the liability the trustee has in the decision making . . ..' He either overlooked or brazenly ignored the duties imposed upon him by his original appointment and by the Chapter X statutes. Simply stated, Chaney's March, 1974, testimony on his limited duties as trustee is absurd.
 
 
 52
 Worthy of comment is the fact that in his application Chaney claimed the full $52,500.00 in connection with '. . . services rendered by your Trustee in this proceeding during the last five and one-half years, over and above the amounts of interim compensation . . ..' (Emphasis added.) When testifying at the March 25th hearing on the application, he swore that the services for which he was seeking compensation were rendered not only as trustee, but also in his capacity as building manager, real estate agent and rent collector. Manifestly, his management, leasing and sale of the property was in his capacity as trustee, rather than in a personal capacity on which he might be entitled to supplemental compensation. Our decision[7] affirming the district court's order of sale makes it clear that the property was sold by Chaney as trustee pursuant to the provisions of § 516(3).
 
 
 53
 Among the services for which the final payment is claimed, although not classified by Chaney as one of his services as trustee, is a claim for a real estate commission under his hat as a real estate broker for the contract of sale which he signed as trustee in which there is a commitment to pay a third person a broker's commission of $50,000.00. The order authorizing the sale of real property, dated March 2, 1973, contains a recitation that the total purchase price of $1,750,000.00 was 'net of real estate commission.' These proceedings make it clear that one Uyeda, rather than Chaney, was the broker on the sale of the real property. Chaney's deception, whether deliberate or otherwise, is demonstrated in the March 25, 1974, hearing by his concealment of the fact that a $50,000.00 brokerage fee had already been paid to Uyeda.
 
 
 54
 In re Ira Haupt & Co., supra, and similar cases present no foundation for permitting a trustee to collect excessive compensation by segregating his duties and pretending to act nonofficially when, in fact, he is performing in an official capacity. The rule stated in Haupt is sound. A trustee in bankruptcy is not required to render legal service. 11 U.S.C. § 641 permits a separate award to the trustee and to his attorney. If, under proper circumstances, the trustee acts in the dual capacity of trustee and attorney, he may be awarded additional compensation for his services in the latter capacity. Cases such as Haupt do not support Chaney's contentions.
 
 
 55
 The amendment to § 72 of the Bankruptcy Act (11 U.S.C. § 112) introducing the language '. . . as required by this Act.' is of no aid to Chaney. The legislative history[8] of the amendment makes it clear that a trustee might secure compensation for services not required by the Act. Clearly, this amendment was introduced to permit a trustee to also act as an attorney in small cases and thus minimize the cost of administration.[9]
 
 
 56
 To allow Chaney to wear the many hats under which he claims compensation would violate one of the fundamental rules governing a person serving in a fiduciary capacity. He cannot deal with the trust estate so as to personally benefit himself. Under his four or more hats, Chaney has been awarded $162,359.14, while his private corporation, Aaron M. Chaney, Inc., has been awarded the sum of $108,716.62 for janitorial service, a total of $271,075.76. This is in sharp contrast to the $142,000.00 left available for distribution to the unsecured creditors of the estate.
 
 
 57
 The district court's finding that Chaney '. . . has not received double pay or triple pay or quadruple pay under the aegis of any particular duplication or quadruplication of hats' is contradicted by the record and is clearly erroneous. The compensation awarded to the trustee is grossly excessive and the district court clearly abused its discretion in making the award.
 
 ALLOWABLE COMPENSATION
 
 58
 We are taught by the foregoing guidelines that trustees in bankruptcy and their attorneys are public officers and are not to be compensated on the basis of what might be reasonable in the private field of endeavor. We are also taught that we may look to the compensation of public employees performing similar duties in fixing reasonable compensation and that economy in administration and the length of time expended by the officers in the service rendered are highly important factors in fixing the compensation to be allowed. Additionally, we recognize that we not only have the right, but that it is our duty to set aside excessive awards and to utilize our own collective experience in fixing reasonable compensation.
 
 
 59
 The district court found Chaney to be an excellent administrator and one having considerable experience in the administration of bankrupt estates. However, we gather from the record that he is active in many enterprises and spent a relatively small amount of his time in the administration of this particular estate. In one report, he estimated his time for services to the estate at four hours per week. This was during the period June 29, 1968, to February 1, 1969, a period when he was acting as receiver. In a later report, he charged the estate with 24.48 hours during one month, which would average approximately six hours per week. However, during the following three months the average hours per month were approximately six hours. In the thirty-three weeks from June 15, 1969, to January 31, 1970, the average per week during this period was less than two hours. In the entire period for which he kept time sheets, the time expended would average not in excess of three hours per week.
 
 
 60
 On the spotty, meager and fragmented record before us, we will assume that Chaney devoted five hours per week of his time to service in his official capacity as trustee. He served for approximately five and one-half years, a total of approximately 286 weeks, or a total of 1,430 hours. In the hearing of April 14, 1972, Chaney indicated that he valued his own services at $50.00 per hour and those of his associates at $25.00 per hour.
 
 
 61
 We are taught by Newton, supra, Fox Markets, supra, and other authorities that time is a significant factor in arriving at just compensation in a Chapter X proceeding. We have already intimated that the courts in fixing reasonable compensation for trustees and their attorneys should take into consideration the compensation paid to other public officials. We have in mind, of course, judges, referees[10] in bankruptcy, and attorneys in the highest bracket of federal service, GS--18. During the period in question the annual salary of federal circuit judges has been $42,500.00, of district judges, $40,000.00, and of the highest paid attorneys in federal service, $36,000.00. Assuming, for the purposes of our analysis, the mentioned judges and attorneys are entitled to a four-week vacation each year and that they serve 35 hours a week for 48 weeks in their official capacities, each would work 1,680 hours a year. (Here, we take judicial notice of the well-known fact that a majority of federal judges and most high-grade federal attorneys work in excess of 35 hours per week.) Computed on the basis of this formula, a federal circuit judge receives approximately $25.00 per hour, a federal district judge, approximately $24.00 per hour, and the highest paid federal attorney in federal service (with the exception of The Attorney General and possibly a few in the Executive Department) is approximately $21.00 per hour. Computed on the same basis, the hourly compensation of a referee in bankruptcy is approximately $18.75, he receiving an annual salary of $31,500.00 during the period under scrutiny.
 
 
 62
 Needless to say we recognize, as did Newton and other courts, that something additional may need to be paid to trustees, and for that matter their attorneys, to attract top flight men to exacting temporary employment. We must recognize that federal incomes are not truly reflective of actual compensation in that there are fringe benefits which would substantially raise the real income of these employees. However, to award a trustee in bankruptcy as just compensation almost five times the hourly rate of the district judge passing upon the award to the trustee shocks the conscience of the court and on its face is violative of § 241. Approximately twice the hourly rate of a district judge should be sufficient. In a recent decision of our court, In the Matter of U.S.A. Motel Corporation, 521 F.2d 117 (1975), we branded as 'grossly excessive' an award of $62.00 an hour to a trustee in a Chapter X proceeding and reduced the fee to $35.00 per hour. Conceding that every Chapter X proceeding presents different problems and that the one before us is no doubt more complicated than the proceeding before the court in U.S.A. Motel Corporation, nonetheless it supports the conclusions we here record. If $40.00 per hour, nearly twice the hourly rate of the district judge passing upon the awards is allowed, Chaney would be entitled to a total of $57,200.00.
 
 
 63
 Although § 48 of the Bankruptcy Act (11 U.S.C. § 76), dealing with the compensation of trustees in ordinary bankruptcy, is expressly made inapplicable to fees allowed in Chapter X proceedings by 11 U.S.C. § 641, there is no sound reason we cannot also look to the former for some guidance in arriving at a reasonable fee on the record before us. No doubt, the exclusionary language of § 641[11] was introduced into the legislation to prevent a Chapter X trustee from collecting excessive fees in cases, such as this, where the proceeding was a failure, and in cases, such as here, where the trustee has had massive assistance not only from his own attorney, but also from other interested parties. Here, the district court recognized that Huber, attorney for Mass. Mutual, rendered valuable services to the estate, as did Kim, attorney for the debtor, thus acknowledging that the trustee and his attorney were not alone in rendering assistance in the unsuccessful proceeding.
 
 
 64
 In the administration of an ordinary bankrupt estate, the trustee is entitled to such fees as the court may allow, but in no event to exceed ten percentum on the first five hundred dollars or less, six percentum on moneys in excess of five hundred dollars and not more than fifteen hundred dollars, three percentum on moneys in excess of fifteen hundred dollars and not more than ten thousand dollars, two percentum on moneys in excess of ten thousand dollars and not more than twenty-five thousand dollars, and one percentum on moneys in excess of twenty-five thousand dollars, upon all moneys disbursed or turned over by him to any persons, including lienholders. However, when the trustee, as here, conducts the business of the bankrupt, he is entitled to receive such an amount as may be allowed by the court, but in no event to exceed twice the maximum allowance permitted in a normal administration. 11 U.S.C. § 76(c)(1), (2). Applying this formula to the record before us, we find that as of January 31, 1974, the trustee had disbursed a subtotal of $1,071,401.19. To this we add the sum of $1,750,000.00,[12] the total sales price of the property as authorized by the court order of March 2, 1973. This would make total disbursements of $2,821,401.19. Using the percentages prescribed by the statute, the trustee in an ordinary bankruptcy proceeding would be entitled to a maximum compensation award of $57,258.00. We must remember that this is a maximum fee.
 
 
 65
 The following segments of Rule 219 of the Bankruptcy Rules in effect at the time of the final hearing in March, 1974, are in full accord with our conclusions. We quote from the relevant portions of the rule.
 
 
 66
 219(c)(1) '. . . The compensation allowable by the court to a trustee . . . for services rendered in the administration of a bankrupt estate shall be reasonable, and in making allowances the court shall give due consideration to the nature, extent, and value of the services rendered as well as to the conservation of the estate and the interests of creditors.'
 
 
 67
 219(c)(2) '. . . The compensation allowed by the Act to a trustee, . . . shall be in full compensation for the services performed by him as required by the Act and by these rules . . . Additional compensation may be allowed for legal or other services not required of him by the Act or by these rules, but only if such services were authorized by order of the court before they were rendered.'
 
 
 68
 219(d) '. . . nor shall he (a trustee) share or agree to share in the compensation of any other person rendering services in a case under the Act or in connection with such a case. . . . If a person violates this subdivision, the court may deny him compensation, . . . or may enter such other order as may be appropriate.'
 
 
 69
 New Chapter X Bankruptcy Rule 10--215, effective August 1, 1975, is substantially the same as Rule 219.
 
 
 70
 It is our considered judgment that $57,200.00 is reasonable compensation to be awarded to Chaney.AARON M. CHANEY, INC. AWARD
 
 
 71
 By the court order of November 4, 1970, Royal Maintenance Service, a division of Aaron M. Chaney, Inc., was awarded $108,716.62 for maintenance, cleaning and allied services to the York properties.[13] Chaney owns all, or practically all, of the capital stock of Aaron M. Chaney, Inc. The record does not disclose the profit made by the corporation for the services rendered to York, but it is clear that Chaney derived a profit from the operation.[14]
 
 DISCUSSION
 
 72
 It is a fundamental rule that a trustee is not permitted to make an independent profit in the administration of any estate, bankrupt or otherwise. Judge Learned Hand, concurring in Sexton v. Sword S. S. Line, Inc., 118 F.2d 708 (CA2 1941) (Reorganization under then § 77(b) of the Bankruptcy Act) succinctly states the rule as follows: 'There is of course no doubt that a fiduciary must restore to the estate all gains to which he may become entitled, rising out of any transaction between himself and a firm of which he is a member or in which he is interested in any other way.' Id. at 711. There, the trustee was surcharged with one-half of the fee paid to a ship brokerage firm in which he had an equal right to participate in the profits. It was there held that the taking of such a commission was a violation of the trustee's fiduciary obligation, regardless of lack of prejudice to the estate. Sexton is cited with approval in Schein v. Chasen, 478 F.2d 817, 822 (CA2 1973).
 
 
 73
 In addressing the same type of problem, the Supreme Court in Woods v. City National Bank & Trust Co. of Chicago, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941), held that 'reasonable compensation for services rendered' under Chapter X '. . . necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act.' Id. at 268, 61 S.Ct. at 497. While the facts in Woods are distinguishable from York, there, as here, the trustee had conflicting interests. The Woods court held that awards made in connection with the administration of the estate to persons with conflicting interests were not proper within the meaning of § 242 of the Bankruptcy Act (11 U.S.C. § 642). In our analysis, we discern no valid distinction between the allowance of fees and the obligations of a trustee under that section and § 241, which governs our decision. In Woods, the Supreme Court said that a fiduciary who represents several masters may not perfect a claim for compensation by insisting that his primary loyalty was not weakened by the pull of his secondary one. Furthermore, questions of fraud or unfairness were held irrelevant once a conflict of interest was shown. Holland v. McIlwaine, 223 F. 777 (CA4 1915), summarizes the general rule as follows:
 
 
 74
 'When one accepts the position of trustee of a bankrupt estate, he renounces the right to compensation in any other form or guise. All services rendered must be referred to his position as trustee.' Id. at 778.
 
 
 75
 Consequently, Judge Tavares' order of November 4, 1970, authorizing the arrangement with Royal Maintenance, does not prevent us from inquiring into the unwarranted personal profits that Chaney may have made from the arrangement.
 
 
 76
 Strange as it may seem, there is absolutely nothing in the application for compensation which would indicate that on November 4, 1970, the court was going to consider any type of a contract between the trustee and his corporation. Moreover, the record is silent as to notice to creditors, or other interested parties, of any proposal to engage the janitorial service. The notice of the hearing approved by the court in the order fixing the time and place of hearing made no mention whatsoever of a proposal to engage the services of the subsidiary of the corporation. At the opening of the November 2nd hearing, Burgess represented to the court that notice had been '. . . duly sent to all creditors . . .' and that the hearing was being held for four specific purposes: (1) expenditure for renovation of the building, (2) trustee's application for interim compensation, (3) his own application for compensation, and (4) approval of the Dunn settlement.
 
 
 77
 Despite this representation, and failure to give notice to the creditors, Burgess proceeded to present testimony on the services rendered by the corporation's division, Royal Maintenance Service, and the reasonable value of those services, i.e., $1,871.00 per month, plus gross state income tax. It was based on this hearing, without notice, that Judge Tavares entered the November 4, 1970, order authorizing Chaney to pay his own maintenance service the monthly sum above mentioned.
 
 
 78
 A conflict of interest is clear because Chaney, as trustee, cannot serve two masters: (1) Aaron M. Chaney, Inc. and (2) York, its creditors and the court. On the one hand, he was vitally interested in making a profit for himself through Royal Maintenance Service. On the other hand, he had a sworn obligation and duty to keep the administrative expenses of the York estate at a minimum.
 
 
 79
 Chaney must account for the profits he made from the above operation of Aaron M. Chaney, Inc. and its division or, failing to do so, he will be required to return to the estate not less than 15% of the total paid to the corporation and its subsidiary.
 
 THE BURGESS AWARD
 
 80
 Burgess, in contrast to Chaney, is to be commended for keeping what seem to be accurate records of his time expended on the affairs of York. However, an examination of the record shows that a substantial amount of that time was expended in puffing Chaney's claims, both in the drafting of formal papers and in appearances before the court in support of those claims. It was Burgess, by his leading questions, who prompted Chaney to manufacture the four hats under which he claimed his final award. It was Burgess who should have been fully aware of the conflicting representations made in the previous reports. He is as responsible as Chaney, if not more so, for the overall puffing of fees.
 
 
 81
 In the reports before the court covering the period from October 8, 1968, to March 28, 1974, Burgess made the following hourly claims for his own services:
 
 
 82
 (1) 234 hours at $50.00 per hour.
 
 
 83
 (2) 105.10 hours at $60.00 per hour.
 
 
 84
 (3) 271.90 hours at $70.00 per hour.
 
 
 85
 He also claimed compensation for 819 hours of legal work performed by associates on the basis of $40.00 per hour, and for 31 hours of work performed by a partner at $50.00 per hour. The total of his presented claims was $71,385.00.
 
 
 86
 Nevertheless, at the final hearing, Burgess claimed a total fee of $95,000.00. He said that this was based on '. . . an average rate of the five and one-half years and it will come to about $65.00 per hour.' His average is for all time put in upon the York case without distinction between the time of his associates and himself. Calculated upon the same basis, the average hourly rate based upon Burgess' presented claims of $71,385.00 is $48.00. Thus, at the final hearing, he sought an increase of $17.00 per hour in the average hourly compensation received by his firm for its work in connection with the York estate.
 
 
 87
 The district court, without mention of the number of hours or of an hourly rate, arbitrarily fixed the total fee at $80,000.00, plus Hawaii state tax of $3,200.00, a total of $83,200.00.
 
 
 88
 In view of claimant's wholesale exaggeration of his own claim, as well as that of Chaney, and of his personal participation in presenting many conflicting reports to the court, we hold that the award of the district court to Burgess is clearly erroneous and that it abused its discretion in making the award.
 
 
 89
 We cannot avoid commenting on Burgess' claim that his vast experience in bankruptcy matters over the course of the years placed him in an exceptionally well qualified list of attorneys. As such, we must assume that he was fully aware of the rule which required Chaney to keep accurate records of his time. Burgess was Chaney's legal advisor. Not only did he fail to insist that Chaney keep adequate time records, instead he actively assisted Chaney in grossly exaggerating the claims to trustee fees and in making highly contradictory representations to the court.
 
 
 90
 By no standard is Burgess entitled to a fee in excess of $71,385.00, the total of the sums claimed under his report. Instead, however, by reason of his active participation in preparing and presenting, both in sworn testimony and in verified reports, grossly excessive and conflicting claims on his own behalf and on behalf of Chaney, we must reduce not only the grossly excessive award by the court, but also the total amount claimed by him for services in the report which he filed. We find that he should receive as reasonable compensation the same hourly amount he claimed for some of his associates, i.e., $40.00. The total hours claimed by himself and his associates in his reports is approximately 1,462 making a total award of $58,480.00.
 
 
 91
 Despite what is said by the district court and argued by appellee, Fox Markets is no authority for the exorbitant and flagrantly excessive fees here sought and awarded. In Fox Markets, the attorneys were specialists in the trial field employed for the specific purpose of preparing and trying a legal action which involved highly intricate questions of law and fact. The regular attorney for the trustee was not even involved.
 
 AWARDS TO HUBER AND KIM
 
 92
 We agree with the district court that the services of Huber, attorney for Mass. Mutual, and Kim, attorney for the debtor, were of benefit to the estate and that the awards to those attorneys are reasonable.
 
 STANDING
 
 93
 Aside from the court's inherent duty, sua sponte, to intervene in bankruptcy proceedings where it appears that grossly excessive fees have been awarded, we are of the opinion that appellants, in their own right, have standing to object to such allowances. It is quite possible that a substantial reduction in the award of compensation will place sufficient funds in the pending bankruptcy proceeding to pay the creditors in full and create a fund for distribution to the debtor and its stockholders. However, we need not speak to this issue. As mentioned, we only have a duty to prevent the allowance of grossly excessive compensation.
 
 APPELLANTS' ATTORNEYS FEE
 
 94
 Our analysis of the record and our findings and conclusions on appeal, convince us that this is the type of litigation in which the appellants' attorneys should be awarded adequate compensation for services rendered in preventing the awards of grossly excessive compensation to a trustee and his attorney. By the partially successful prosecution of this appeal, the appellants' attorneys have substantially reduced the awards to the trustee and his attorney. In these circumstances, appellants' attorneys are entitled to a reasonable fee, which we fix at $10,000.00.
 
 CONCLUSION
 
 95
 The order of the district judge on the issue of jurisdiction is affirmed, as are the fee awards to Huber and Kim.
 
 
 96
 The orders of the district judge with reference to the allowance of compensation to Chaney are vacated and set aside. He is awarded a total fee of $57,200.00 as reasonable compensation for all services performed in the Chapter X proceeding. Further, he is ordered and directed to repay to the clerk of the district court, the difference between this award and that awarded to him by the district court, i.e., the sum of $105,159.14, together with interest thereon at the rate of 8% per annum from the 28th day of March, 1974, until paid.
 
 
 97
 The orders of the district judge with reference to the allowance of compensation to Aaron M. Chaney, Inc., and its division, are vacated and set aside. This issue of compensation is remanded to the district court for a full-fledged hearing on the profits received by Chaney from the services rendered by the corporation and its division to the debtor during the course of the Chapter X proceeding. Chaney shall repay to the clerk of the district court the profits so obtained, or in lieu of a full-fledged accounting, repay to the clerk of the district court 15% of the total amount paid to the corporation, or its division, as above delineated.
 
 
 98
 The orders of the district judge with reference to the allowance of compensation to Burgess are vacated and set aside. He is awarded a total fee of $58,480.00 as reasonable compensation for all services performed in the Chapter X proceeding. Further, he is ordered and directed to repay to the clerk of the district court, the difference between this award and that awarded to him by the district court, i.e., the sum of $24,720.00, together with interest thereon at the rate of 8% per annum from the 28th day of March, 1974, until paid.
 
 
 99
 Attorneys for appellants are awarded the sum of $10,000.00 as reasonable attorney fees on this appeal, said sum to be paid out of the estate. Costs on appeal are awarded to appellants, the amount to be paid by appellees.
 
 
 100
 We suggest that the district court, of its own motion, reconsider its action in appointing Chaney as trustee and Burgess as attorney for the trustee in the pending bankruptcy proceeding, and thereafter proceed to follow the statutory directions by permitting the remaining creditors to select a trustee of their own choice. The result of this decision is to place both the trustee and his attorney in an irreconcilable position insofar as the best interests of the creditors are concerned.
 
 
 101
 Upon failure of the district court to reconsider its action, as above suggested, within a reasonable period of time, the appellants may apply to this court for such supplemental relief as may seem meet and proper in the premises.
 
 
 102
 It is so ordered.
 
 APPENDIX A
 
 103
 '6. That Aaron Chaney be, and he hereby is, appointed trustee of the estate of said debtor, and said trustee upon filing a bond, as hereinafter provided, shall be vested with all the title and, to the extent consistent with said Chapter X, shall be vested with the same rights, shall be subject to the same duties, and shall exercise the same powers as a trustee appointed pursuant to Section 44 of said Act, and shall have and may exercise such additional rights and powers as a receiver in equity would have if appointed by a court of the United States for the property of said debtor.'
 
 
 104
 '8. That said trustee be, and he hereby is, authorized to operate the business and manage the property of said debtor until such time as this court shall otherwise prescribe, . . .
 
 
 105
 '9. That . . . to the extent consistent with Chapter X of said Act, said trustee shall have full power and authority until further order of this court,
 
 
 106
 (a) To employ, discharge and fix the compensation, salaries and wages of all managers, agents, employees and servants, other than officers as he may deem necessary and advisable for the proper operation of the business and the management, preservation and protection of the property of said debtor;
 
 
 107
 (b) To purchase or otherwise acquire for cash or on credit, such materials, equipment, machinery, supplies, services or other property, as he may deem necessary and advisable in connection with the operation of said business and the management and preservation of said property;
 
 
 108
 (c) To sell merchandise, supplies and other property, and to render services, for cash or on credit;
 
 
 109
 (d) To enter into any contracts incidental to the normal and usual operation of said business and the management and preservation of said property;
 
 
 110
 (f) To collect and receive all rents, issues, income and profits, and all outstanding accounts, things in action and credits due or to become due to the within estate, and to hold and retain all monies thus received to the end that the same may be applied under this and different or further orders of this court;
 
 
 111
 (g) To do any and all such things and to incur such other expenses as may be necessary and advisable in the proper management and conduct of the affairs of said debtor and in the preservation and protection of the property and assets of the within estate;
 
 
 112
 (h) To institute, prosecute, defend, compromise, adjust, intervene in or become a party to such other actions or proceedings in law or in equity, in state or federal courts, as may in his judgment be necessary or advisable for the protection, maintenance and preservation of the property and assets of the within estate.
 
 
 113
 '10. That until the further order of this court, said trustee, in his discretion, be, and he hereby is, authorized to pay from time to time out of any and all funds now or hereafter coming into his hands and available for such purposes:
 
 
 114
 (a) All taxes and similar charges lawfully incurred in the operation of the business and the preservation and maintenance of the property and assets of the within estate since the filing of said petiton;
 
 
 115
 (b) All proper expenses and obligations incurred by him on or after the date of this order in operating the business and preserving and maintaining the property and assets of the within estate, as herein authorized, including among other expenses and obligations, the reasonable wages, salaries and compensation of all managers, agents, employees and servants, other than officers, employed by him;'
 
 
 116
 (Emphasis added.)
 
 
 117
 On Petitions for Rehearing and Suggestions for Rehearing In Banc
 
 
 118
 'In his petition for rehearing and suggestion for a rehearing in banc, the appellee Burgess challenges the accuracy of our factual statement in certain respects. We respond as follows:
 
 
 119
 (1) He says there is nothing in the record to support our statement that '. . . a substantial amount of (Burgess's) time was expended in puffing Chaney's claim . . ..' On the record before the district court and the one before the district court and the statement is obvious. Not only did Burgess prepare the voluminous reports, exhibits, orders and other data to support the excessive claims of Chaney, he appeared in court pressing those claims, and calling witnesses to support them.
 
 
 120
 (2) Next, Burgess challenges our statement that he failed '. . . to insist that Chaney keep accurate time records . . .' and insists that this statement is not supported by '. . . one scintilla of evidence.' He concedes that Chaney did not keep accurate records and now claims that he '. . . implored him to keep track of his time, but Chaney did not follow this advice.' In other words, he concedes a duty to advise Chaney to keep records, but failed to insist upon compliance with the advice. Instead, he assisted Chaney in pressing compensation claims which were grossly excessive. Throughout his petition, Burgess completely ignores the fiduciary capacity in which both he and Chaney were acting.
 
 
 121
 (3) Next, Burgess claims our statement that he failed to give proper notice of the making of the contract with Royal Maintenance is totally unwarranted. Again we say, that there is nothing in the notice, nor in the application upon which the hearing was held, that would suggest any such agreement was to be considered. True, Burgess and Chaney recognized the potential conflict of interest and drew this to the attention of the court. However, there is nothing in the record to show that the creditors received notice of the making of the contract, of the potential conflict of interest, or of the time when the matter would come on for hearing. Burgess was hand-in-hand with Chaney in securing the approval of this conflict of interest contract. The fact that no objection was made until 1974 is of no consequence. As previously stated, both Chaney and Burgess were acting in a fiduciary capacity.
 
 
 122
 (4) Next, Burgess challenges our statement that he presented a '. . . wholesale exaggeration of his own claim.' He concedes that if he were paid on a straight time basis, his fee would be slightly in excess of $70,000.00, the precise amount of which is mentioned in our opinion. The claims he presented were on the basis of '(1) 234 hours at $50.00 per hour, (2) 105.10 hours at $60.00 per hour, and (3) 271.90 hours at $70.00 per hour.' On the final hearing, in contrast to his previous claim, he claimed a total fee of $95,000.00 which would be at an average rate, he says, of '. . . about $65.00 per hour.' In attempting to justify the unwarranted increase in his claim from something slightly in excess of $70,000.00 to $95,000.00, he again attempts to steer the court in the direction of fees in the private, rather than in the public sector. Our statement properly described appellee's arbitrary compensation leap over $20,000.00 as a 'wholesale exaggeration.'
 
 
 123
 (5) Next, Burgess argues that our statement that he prepared and presented '. . . conflicting claims in his own behalf, and on behalf of Chaney,' is not supported by the record. If the verified fee claims for a total of slightly in excess of $70,000.00 are not in direct conflict with his claim, out of the blue, for $95,000.00 in the final hearing, it is difficult to imagine what might be a conflict. The remainder of his argument on this point is based principally on the fallacious premise that he had nothing to do with overreaching or puffing of compensation claims either for himself or on behalf of Chaney. The record is clear that he actively participated in presenting all of Chaney's claims and in urging them upon the court. Although he presses upon us an argument that Chaney ignored his advice in failing to keep time records, he, in the next breath, takes the position that there was no wrongdoing whatsoever by Chaney.
 
 
 124
 Aside from our misstatement on the payment of the $50,000.00 real estate commission, Burgess is quarreling with our choice of language, rather than with the accuracy of the facts as stated in our opinion.
 
 
 125
 Aside from our misstatement on the payment of a $50,000.00 brokerage fee to Uyeda, we find no merit in Chaney's petition for rehearing and suggestion for rehearing in banc.
 
 
 126
 At the hearing upon the sale of York's real property, Chaney and Burgess represented that one of the advantages of the Lim offer was that no real estate commission was to be paid on that offer. In approving the sale, the order of the court authorized the sale 'net of real estate commission.' Despite this previous representation and the order of the court, at the March 25th hearing, Chaney, and to a lesser extent Burgess, made it perfectly clear that Chaney was claiming compensation in four categories, one of which was '. . . the performance of brokerage performance (sic) to try and secure a purchaser for the property.' Not only was he trying to secure in that hearing compensation as a broker, he was also trying to get compensation for management of the property and for leasing and releasing the space in the building, all in addition to his compensation claim as '. . . performance as a trustee.' Chaney in this hearing went into detail on what was usual and customary compensation for brokerage services, saying that it would not be less than 5% of the sales prices and 'extending on upward.' He then testified that '. . . a fair compensation under the circumstances of employment in the sale of a property of this type . . .' would be 6%.
 
 
 127
 The fundamental conflict between the position taken by Burgess and Chaney at the time of the hearing on the offer of sale and the position taken by them on the final hearing in connection with the final award of fees, is not in any way affected by the fact that the $50,000.00 mentioned in our opinion was not, in fact, paid to Uyeda. The overreaching and attempting to collect a real estate commission on the sale of the real property is just as apparent without any mention of the $50,000.00 commission.
 
 
 128
 It makes little difference whether Chaney was deliberate in his actions or was sloppy and careless, an argument which he now presses on the court. The fact is that he deceived the court and secured an award of fees almost two and one-half times the maximum amount he could possibly have received in an ordinary bankruptcy proceeding. This type of conduct in the administration of a bankrupt estate cannot be tolerated.
 
 
 129
 Nowhere in our opinion did we say that Chaney had concealed the Royal Maintenance contract from the court. We said, and the record fully supports our statement, that the creditors were not notified of the negotiations leading up to, or the entry into, the contract prior to the hearing in which approval of the court was sought. Cases such as Mosser v. Darrow, 341 U.S. 267, 274, 71 S.Ct. 680, 95 L.Ed. 927 (1951), cited by Chaney, support our view that he violated his fiduciary duty. There the Court was speaking of a mistake in business judgment by a trustee. No such mistake is before us. This record presents a clear cut violation of the rule against personal profit by one acting in a fiduciary capacity. In speaking of forbidden acts, the Mosser Court said:
 
 
 130
 'The most effective sanction for good administration is personal liability for the consequences of forbidden acts, and there are ways by which a trustee may effectively protect himself against personal liability.' (Emphasis supplied.) 341 U.S. at 274, 71 S.Ct. at 683.
 
 
 131
 Chaney's arguments (1) that he practiced no deception, (2) that the Chapter X proceeding was a success, and (3) that our approach to reasonable compensation is unrealistic, are fully covered in our opinion and require no additional comment.
 
 
 132
 To correct the misstatement in connection with the $50,000.00 brokerage commission, the slip opinion filed on October 23, 1975, in these cases is revised in the following respect: The final paragraph on page 1071, commencing with the word 'Among' and ending with the word 'Uyeda' on page 1071 is deleted and the following paragraph is substituted therefor:
 
 
 133
 'Among the services for which the final payment was claimed, although not classified by Chaney as one of his services as trustee, is a claim for a commission under his hat as a real estate broker for the sale of the trust real estate. In the hearing leading up to the order of March 2, 1973, authorizing the sale, Chaney, in answer to a question by Burgess, represented to the court that the sales price was $1,750,000.00 and that 'there would be no brokerage commission.' The order authorizing the sale followed through on this representation by reciting that the total purchase price of $1,750,000.00 was 'net of real estate commission.' These proceedings make it crystal clear that no commission was to be paid to Chaney or anyone else on the sale of the real property. Chaney's deception, whether deliberate or otherwise, is demonstrated by his position in the March 25, 1974, hearing in which, under one of his hats, he claimed some type of compensation or commission on the sale which he previously testified was free and clear of any such commission.'
 
 
 134
 The panel as constituted in the above case has voted to deny the petitions for rehearing. Circuit Judge GOODWIN votes to reject the suggestions for rehearing in banc. Circuit Judges BARNES and KILKENNY recommend a rejection of the suggestions for rehearing in banc.
 
 
 135
 The full court has been advised of these suggestions for an in banc hearing and no judge of the court has requested a vote on the suggestions for rehearing in banc. FRAppP 35(b).
 
 
 136
 The petitions for rehearing are denied and the suggestions for rehearing in banc are rejected.
 
 
 137
 Circuit Judge CHOY recused himself from consideration of the petitions for rehearing and the suggestions for a rehearing in banc.
 
 
 
 [1]
 The text of that order reads as follows:
 'Upon the motion of Appellee, AARON M. CHANEY, Trustee, good cause appearing, it is hereby
 'ORDERED, ADJUDGED AND DECREED that the United States District Court for the District of Hawaii is authorized to hold a hearing pursuant to § 236(2) of the Bankruptcy Act (11 U.S.C.A. § 636(2)) and, if the said District Court finds it proper, to adjudge the Debtor bankrupt, proceed with bankruptcy, and make such other and further orders as it deems advisable or proper.'
 
 
 [2]
 The following exchange appears in the reporter's transcript:
 'THE COURT: * * *
 I find, from a review of the evidence here, that the corporation is insolvent; that its only assets now are just money; and that the corporation should be and it is hereby adjudicated bankrupt, and I am prepared to appoint a trustee in bankruptcy. Who is recommended?
 'MR. BURGESS: Your Honor, Mr. Chaney would be fully qualified to act as the Trustee in bankruptcy. Since he has served now for these many years as Trustee in reorganization, it would be logical to also appoint him as the Trustee in bankruptcy. He is willing to serve in that capacity if the Court should so find.
 'MRS. RYAN: I would just state on the record Doctor You's and the corporation's objection to the appointment of Mr. Chaney.
 'THE COURT: The Court, being fully apprised of the background of this case and of Mr. Chaney's actions as Trustee in attempted reorganization, feels he would be the best choice as Trustee in bankruptcy and he is so appointed.'
 
 
 [3]
 We there said:
 'The sale in question was not a reorganization plan, nor was it made pursuant to such a plan. It was in lieu of such a plan, was authorized under 11 U.S.C. § 516(3), and was made in conformity with that section. The court did not abuse its discretion in ordering or in approving the sale.
 'Appellants' remaining contentions fall into three categories: some are frivolous, others are not properly before us in this appeal, and others are mooted by our decision as to the sale. None merits consideration here.
 'Affirmed.'
 
 
 [4]
 Here objections were made
 
 
 [5]
 Apply to Burgess, as well as Chaney
 
 
 [6]
 See Appendix A
 
 
 [7]
 See nt. 3, supra
 
 
 [8]
 Analysis of H.R. 12889, 74th Cong., 2d Sess. at 234 (1936)
 
 
 [9]
 Hearings on H.R. 6439 and H.R. 8046 before the Subcommittee on Bankruptcy of the House Committee on the Judiciary, 75th Cong., 1st Sess., at 359--360 (1937)
 
 
 [10]
 Now Judges
 
 
 [11]
 'And such compensation of referees and trustees shall not be governed by §§ 68 and 76 of this Title.'
 
 
 [12]
 For the purpose of calculating the trustee's fee under this section, we treat the assumption of the existing mortgages as a disbursement
 
 
 [13]
 'Q. In these current operating expenses that we've discussed, there was a considerable amount of money that was paid by Aaron Chaney, Trustee, to Aaron Chaney, Inc., for maintenance, cleaning and allied services, is that correct?
 A. That is correct.' (R.T., p. 51--A, Vol. 15) (Emphasis added.)
 
 
 [14]
 'Q. All right. But, when you charge the debtor for these accumulated items for these services, aren't you also including, in arriving at your fees for janitorial and other services, supervisory or monies to compensate for supervisory services?
 A. Precisely the same that our competitors in the janitorial services would do, too.
 Q. This, of course, is an anomaly, is it not, where you hire yourselves to do the work and you supervise your own work?
 A. No. We find more and more that this type of service is being performed by other property management firms. No matter who cleans the building, the manager is blamed if it is dirty, or if there is no soap or toilet paper, hand towels, whatever the case may be. So, after years of frustration, we felt we would get into it and bought out another company.' (R.T. pp. 52--53, Vol. 15).