In the Matter of FERKAUF, INCORPORATED, f/k/a Ferkauf, Roggen Inc. and Ferkauf, Roggen, Bressman & Clasen, Inc., Debtor.

Bankruptcy No. 74–B–1200 (HCB).

United States Bankruptcy Court,
S.D. New York.

Sept. 6, 1984.

As Corrected Sept. 25, 1984.

**DECISION & ORDER**

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Ferkauf, Inc. ("Ferkauf" or "Debtor"), a member firm of the New York Stock Exchange ("NYSE" or "Exchange"), was notified in March of 1974 that it was in violation of the Exchange's minimum capital requirements and would be obliged to terminate its membership as of the close of business March 29, 1974. As a result of this notice, Ferkauf immediately initiated discussions with another NYSE member, J.H. Kern & Co. ("Kern"), concerning the possible acquisition of certain Ferkauf assets by Kern. After a tentative agreement reached by the two brokerage houses was abandoned by Kern, a petition was filed in this Court on August 21, 1974, pursuant to § 59b of the Bankruptcy Act commencing an involuntary proceeding for the liquidation of Ferkauf's assets. By order of this Court, Ferkauf was adjudicated bankrupt September 5, 1974.

**I**

Presently, nearly one decade after the commencement of this action, we are asked to undertake the unsavory task of reviewing the fee applications of the trustee, Allan Feingertz and his counsel, Alex Rosen (1974–1976) and Paul Krohn (1976 to present). No creditors have filed objections to these fee applications; this Court nevertheless is duty bound thoroughly to review fee applications, *sua sponte*, in order to determine whether the compensation requested is reasonable. *York International Building, Inc. v. Chaney*, 527 F.2d 1061, 1077 (9th Cir.1975). *In re Aminex Corp.*, 15 B.R. 356, 360, 5 C.B.C.2d 155 (Bankr.S.D.N.Y.1981). Further, this Court retains broad discretion in awarding appropriate fees in matters before it. *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1298 (5th Cir.1977) *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *In re Auto-train Corp*, 15 B.R. 160, 161 (Bankr.D.C.1981). Such discretion, however, is not personal in nature but is of general application and formed by appropriate precedent and procedure. *Matter of First Colonial Corp. of America*, 544 F.2d at 1298 (5th Cir.1977); *Massachusetts Life Insurance Co. v. Brock*, 405

F.2d 429, 432 (5th Cir.1968) *cert. denied,* 395 U.S. 906, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1969).[1] Aware of these responsibilities, we proceed.

## II

### *The Fee Application of Current Counsel to the Trustee*

#### A.

Pursuant to an order of this Court issued August 13, 1976, Paul Krohn replaced Alex Rosen as general counsel for the trustee. As such, Krohn consequently carries the burden of establishing the entitlement to and the reasonableness of a professional fee from the assets of the Debtor. *York International Building, Inc.,* 527 F.2d at 1077; *In re Crutcher Transfer Line, Inc.,* 20 B.R. 705, 710 (Bankr.W.D.Ky.1982). Krohn has attempted to satisfy that burden by presenting this Court with an application for allowance which includes a time schedule itemizing those hours spent by both Krohn and David Helfant, of Counsel, accompanied by descriptions of the services performed. *See, In re Hudson & Manhattan R.R.,* 339 F.2d 114, 115 (2d Cir.1964); *see also, In the Matter of Beverly Crest Convalescent Hospital, Inc.,* 548 F.2d 817, 820 (9th Cir.1976); *In re Meade Land & Development Co., Inc.,* 527 F.2d 280, 284 (3rd Cir.1975).

■ While the hours logged by an attorney are highly material to the derivation of a reasonable fee, the time spent on a case by counsel to a trustee in bankruptcy is not, and should not be, "assigned the paramount role in our fee determinations." *In re Aminex Corp.,* 15 B.R. 356, 361 (Bankr.S.D.N.Y.1981); *see also, In re Borgenicht,* 470 F.2d 283, 284 (2d Cir.1972).

Counsel for the trustee should only spend time on those reasonable and necessary functions which preserve and benefit the estate. *See, In re Crutcher Transfer Line, Inc.,* 20 B.R. 705, 710 (Bankr.W.D. Ky.1982). Consequently, the result which counsel is able to achieve as measured by the value of the product to the creditors and the estate, is a primary focus of this Court's review. *Matter of J.J. Bradley & Co. Inc.,* 6 B.R. 529, 6 B.C.D. 1109, 2 C.B. C.2d 1245, 1257 (Bankr.E.D.N.Y.1980).

■ Considering the time spent as indicated on the summary, and the value of the results obtained by general counsel in this case, we find that Krohn's work was characterized by delay and nonproductivity. The Sixth Circuit has observed:

> While a bankruptcy trustee is undoubtedly charged with a duty of preserving property which comes into his custody ... he is also charged with the duty of expeditiously liquidating the estate and avoiding all unreasonable expense either in its preservation or distribution.

*Rife v. Ruble,* 107 F.2d 84, 86 (6th Cir. 1939). Identical standards apply to counsel of the trustee who, upon accepting the engagement, shoulders a duty to his client, to the court and to the creditors of the estate to expedite both the liquidation of the debtor's assets and the disbursement of the proceeds to the creditors. *See,* Herzog, *Fees and Allowances in Bankruptcy,* 36 Conn.B.J. 374 (1962); *2 Collier on Bankruptcy,* 330.05, 330–26 (15th ed. 1981). Krohn and Helfant have failed to persuade this Court that they have adequately fulfilled that duty.

#### B.

Initially, we should note that trustee's counsel in this case was not entirely non-

---

1. Twelve standards proposed by the Fifth Circuit for the determination of reasonable fees are:
   (1) The time and labor required.
   (2) The novelty and difficulty of the questions.
   (3) the skill requisite to perform the legal skill properly.
   (4) the preclusion of other employment by the attorney due to acceptance of the case.
   (5) The customary fee.
   (6) Whether the fee is fixed or contingent.
   (7) Time limitation imposed by the client.
   (8) The amount involved and results obtained.
   (9) The experience, reputation and ability of the attorneys.
   (10) The "undesirability" of the case.
   (11) The nature and lengths of the professional relationship with the client.
   (12) Awards in similar cases.
   *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir.1974).

productive. Rather, upon inheritance of this proceeding from Rosen in mid-1977, applicants were able to successfully complete several actions of significant value to the estate which had been instituted previously. First, after successfully negotiating a settlement with Ferkauf's former counsel, Kleinberg, Kaplan, Wolff & Cohen, which arranged for essential documents concerning Ferkauf's financial status to be released to the trustee,[2] Krohn took over a promising litigation against United Auto Auctions Systems, Inc. ("UAA") claiming securities law violations and common law fraud in connection with the public offering of UAA's shares pursuant to Regulation A (17 C.F.R. § 230.2 (1956)) by Ferkauf as underwriter. Prior to the effective date of that public offering, UAA's license to conduct its auctioneering business had been revoked and the issuer had failed to disclose this to Ferkauf before the offering. Upon discovering the revocation, the Securities and Exchange Commission ("SEC") immediately suspended the offering and Ferkauf's right to underwrite Regulation A stock offerings. As a result of that suspension, Ferkauf claimed to have lost substantial profits and expenses incurred in connection with the aborted public offering of UAA shares and a complete loss of a significant area of its underwriting business. The trustee and Krohn were able to settle this lawsuit by mid-1979, receiving $40,000 from UAA.

Commensurate with those proceedings, the debtor was also involved in an arbitration proceeding with Kern before the NYSE. As a result of negotiations concerning the possible acquisition by Kern of Ferkauf's assets, an agreement was executed on March 28, 1974 in which Ferkauf agreed to appoint one Fred Geller to liquidate its assets and reimburse all of the company's creditors, save for subordinated lenders, and subsequently led to Kern acquiring all of Ferkauf's remaining assets on a subordinated basis.

However, on July 1, 1974, Kern filed with the NYSE a claim asserting material misrepresentations by Ferkauf and its shareholders, officers, and directors and subordinated lenders and discontinued payment of monthly commissions to Ferkauf. Kern subsequently instituted arbitration proceedings before the NYSE. In those hearings, which lasted almost ten months, the Exchange Board ultimately found in favor of Kern, but awarded the trustee $26,400 on his counterclaims.

C.

In addition to these rather limited successes which had increased value of the estate by roughly $70,000 by mid-1979, the applicants, on behalf of the trustee, also initiated several actions in this Court. Clearly trustee's counsel is to be encouraged to pursue promising litigation which is clearly in the best interests of creditors and the estate. But of the ten complaints filed by Krohn on behalf of the trustee and the 45 hours devoted to these actions, only $1,660 was added to the estate. Certainly not every litigation can be expected to reap substantial benefits for the estate; however, a higher standard of judgment is demanded of counsel for the trustee than that which compels the expenditure of almost $5,000 in attorney's fees for a reward of $1,660 to the estate. While this is but a small fraction of the time devoted by Krohn and Helfant to this case, it is significant because it indicates the dilatory and nonproductive tactics of applicants which characterize this entire proceeding.

D.

As noted earlier, it is for the applicant to establish for this Court that its requested compensation is reasonable and deserved. In the instant case, Krohn and Helfant

2. The Kleinberg firm had in its possession substantially all of the bankrupt's records and files with respect to the United Auto Auctions and other underwritings performed by Ferkauf, and refused to turn over the said files, claiming attorney's retaining and charging liens. The controversy was settled, with the Kleinberg firm accepting $2,180 and turning over the documents.

have chosen to meet that burden by consistently impressing upon this court the fact that when they succeeded Rosen in 1976, there was a mere $22,000 in the coffers of the debtor, while presently, those same accounts contain over $358,000. This material gain in value to the estate, however, is largely not the result of their efforts. We need only note that of the $335,000 added to the value of the estate in the past eight years, less than $70,000 has resulted from actions pursued by the applicants. The balance was added upon the sale of the estate's shares of stock in various concerns which netted $157,670 and the accumulation of interest and dividends on the estate's assets which totaled $109,948 as of the end of 1983. Thus, while counsel for the trustee has been successful in pursuing two major proceedings on behalf of the debtor in the late 1970's, it has done little since 1979 to add to the value of this estate.

Since 1979, two matters have almost exclusively occupied Krohn's time, both of which would have been pursued at an earlier stage in the case had the best interests of the public and the creditors been the primary concern of the trustee's counsel. The first of these was the acquisition, protection and sale of Napco Securities Systems, Inc. stock. In May 1973, Ferkauf had obtained 5,000 shares of Napco stock at a nominal price as additional underwriting compensation in connection with its public offering of Napco shares. Sometime after Ferkauf closed its doors and was adjudicated a bankrupt, the Napco stock twice split on a two-for-one basis. While the exact dates of those splits were not provided by either Krohn's application or papers filed in this Court, it is clear that general counsel for the trustee took no action concerning this stock prior to December 5, 1980. Further, no explanation

for these four years of inaction concerning the estate's most valuable asset was given by applicants. All that is apparent is that on December 5, 1980, Krohn initiated eventually successful efforts to obtain replacement certificates for the stock.[3]

Upon obtaining these certificates, in 1981, the debtor was immediately faced with two actions, by Joseph Harris and Ben Zedem, who sought to recover shares of Napco stock which Ferkauf had allegedly sold to them in 1973. Harris averred that he was entitled to 21,000 shares of stock, due to the stock's splits since his original purchase; Zedem likewise claimed entitlement to 6,000 shares. Krohn and Helfant were able to settle these suits favorably for the estate, retaining 21,750 of the 30,000 total shares which were eventually sold for $106,046 which was immediately put on deposit in the debtor's bank accounts. The significance of this action does not lie, however, in the amount of money Krohn and Helfant were able to add to the estate; the shares of stock could have been liquidated at any time after Krohn and Helfant were retained in mid-1976. Likewise, the successful protection of this stock does not greatly influence this Court in applicants' favor. While applicants were successful in persuading Harris and Zedem to settle for substantially less than they originally sought, there is no indication that their claims were sufficiently colorable so as to increase the value of the settlement reached by applicants to the estate. That which is impressed upon this Court concerning these Napco shares is the utter lack of any action by applicants to retrieve this stock and liquidate it prior to December 1980. Regardless of the time of the fortuitous splits in the stock, there is no justification for trustee's counsel having ignored such a significant asset for over four years.[4]

3. Krohn's fee application explains that replacement certificates for the Napco Stock were sought because the original certificates were never delivered after either of the stock splits due to Ferkauf's going out of business.

4. Even had this stock not split into the 30,000 shares prior to 1980, there is still no reason why

a trustee and his counsel should subject creditors involuntarily to the risks of the stock market. Had this estate been closed in 1979 and its proceeds distributed, the creditors could have decided for themselves how to invest the proceeds, including whether to purchase Napco stock, and await a fortuitous split.

Secondly, in 1983, Krohn, on behalf of the trustee, brought an action for contempt against Geller. Geller had been ordered by the court on October 25, 1974 to file a final report as liquidator on or before November 11, 1974. Geller failed to file that report. Why this action was not commenced at any time from 1974 through 1982 is not explained. Indeed, it was brought only upon this Court entering an order directing the trustee to show cause as to why a final report had not been filed. Moreover, the delay in proceeding served to generate more delay, for Geller had misplaced or discarded his records. Consequently, nine months passed while 1974 records were reconstructed. Rather than support the application, this episode further demonstrates the lack of diligence that characterizes this case.

### E.

■ In addition to the nonproductivity and delay noted above, the compensation requested in this application is exorbitant on its face. Specifically, the flat fee of $150 per hour requested by applicants is excessive. First, while it is not and should not be the practice of this court to penalize young attorneys who are capable of achieving results indistinguishable from those of more senior practitioners, the experience of the attorneys involved in a case is a factor in determining a reasonable fee award. *See, Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir.1974). Thus, that Paul Krohn was but three years out of law school in 1976 does not incline this court towards an hourly fee of $150. Moreover, although Krohn's application for allowance boasts of his recent experience in bankruptcy, there is no evidence of comparable experience when Krohn accepted this matter eight years ago. Furthermore, while David Helfant's stated bankruptcy experience is not doubted by this Court, there is no effort by these applicants to distinguish, in terms of fees charged, between the experience of these two attorneys in arriving at an hourly rate. That distinction should be made. *See, Matter of Investors Funding Corp. of New York*,

422 F.Supp. 461, 466 (S.D.N.Y.1976); *See also, Matter of Interstate Stores*, 437 F.Supp. 14, 16 (S.D.N.Y.1977). Even more shocking is the absence in this application of any distinction between rates charged for work completed in different years over the decade this case spans. *See, Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1092 (5th Cir.1980). The $150 per hour figure is not offered as an average rate for the duration of this proceeding, but rather it is proposed as "the going rate" of these two attorneys, presumably as of 1976 as well as 1984.

By our calculations, an appropriate rate for the work done in this case is substantially less than $150 per hour. Tabulating the services performed by Krohn and Helfant as stated in their application shows that the great bulk of time expended on this matter was logged prior to January 1, 1980 (approximately 950 hours), and significantly less work has been performed since that date (approximately 250 hours). With this distinction in mind, we note that from 1980 to present, courts in this Circuit have awarded hourly rates of $100 to $150 per hour for work similar to that done here. *In re Checkmate Stereo & Electronics, Ltd.*, 21 B.R. 402, 6 C.B.C.2d 982, 994 (E.D. N.Y.1982) (a $100 per hour figure is commensurate with prevailing rates in this region); *In the Matter of Minton Group, Inc.*, 33 B.R. 38, 41, 10 B.C.D. 1233 (Bankr. S.D.N.Y.1983) ($125–$150 per hour rate has been "customarily applied in varying fashion"). Prior to 1980, however, the average hourly rates approved were substantially lower, especially when the distinction between learned and inexperienced counsel was noted. *Selzer v. Berkowitz*, 477 F.Supp. 686, 688 (E.D.N.Y.1979) (allowed fees in civil rights suit of $125 per hour for partners' time and between $27 and $65 per hour for associates' time); *Matter of Investors Funding Corp. of New York*, 422 F.Supp. 461, 469 (S.D.N.Y.1976) (interim allowances awarded to general counsel for the Trustee at a rate of approximately $42 per hour, 63% of that firm's average normal fee of $70.00 per hour for combined

associates' and partners' work). Given this broad range of fees, from $70 per hour in 1976 to $150 per hour in 1983 for work similar to that performed here, we cannot justify applying a rate of $150 per hour across the board for this liquidation proceeding.

■ In determining an appropriate hourly rate, moreover, much more must be considered than merely the experience of counsel, the geographical region of the proceeding and the time period during which services were performed. One of the most pressing concerns in awarding professional fees in bankruptcy is to avoid compensating for duplication of services. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir.1974); *Matter of J.J. Bradley & Co. Inc.*, 6 B.R. 529, 6 B.C.D. 1109, 2 C.B.C.2d 1245, 1254 (Bankr.E.D.N. Y.1980). In the present case, of the 210 hours of work done in 1978 for which Krohn seeks compensation, all but 20% is exactly duplicative of work performed by Helfant. To be sure, attorneys must often work closely together on a matter. But when almost 40% of the fees requested for work done in a single year result from having two attorneys perform an individual task, the Court's final hourly rate must reflect such a trend.

■ Furthermore, the nature of the work performed in this case was often ministerial. A large percentage of the billable hours logged by applicants in this case were spent on the telephone or dictating letters. While such activities are certainly necessary for the attorneys to properly function, the hourly fee awarded should be adjusted when a significant percentage of the total work completed is of such a routine nature. Compensation for routine work should be discounted. *Matter of Minton Group, Inc.*, 33 B.R. 38, 41, 10 B.C.D. 1233 (Bankr.S.D.N.Y.1983); *Matter of Dee's Resort Wear, Inc.*, 25 B.R. 591, 591–592 (Bankr.M.D.Fla.1982).

Most important, it is the interests of the creditors and those of the general public which should always receive priority in a bankruptcy proceeding. *In re Yale Express Systems, Inc.*, 366 F.Supp. 1376, 1381 (S.D.N.Y.1973); *See also, Massachusetts Life Insurance Co. v. Brock*, 405 F.2d 429 (5th Cir.1968). This is an estate having general unsecured creditors holding claims totaling approximately $64,000. Had the trustee and his counsel diligently pursued the Napco stock question, it would appear that funds sufficient to pay administration claims and these creditors would have been in hand by early 1980 at the latest. Even with the Napco proceeds in hand, not until this Court ordered, *sua sponte*, at the final hearing was a distribution made to general unsecured creditors.

Undeniably, counsel may not work to build up the estate for the benefit of themselves. *First Colonial*, 544 F.2d at 1291; *In re Orbit Liquor Store*, 439 F.2d 1351, 1354 (5th Cir.1971); *In re Eastwood*, 239 F.Supp. 847, 848 (D.Ore.1965). The accumulation of funds in Ferkauf's accounts, the lack of any disbursement of those funds, the delay in resolving the Geller matter, the institution of lawsuits having an actual value less than the attorney's time charged to them, and the lack of diligence indicate that this case appears to be one in which counsel for the trustee hoped, through delay and the building up of interest in accounts, to justify the exorbitant allowance sought in the expectation that it would be granted because general unsecured creditors will be paid in full. Such tactics are not to be permitted. They denigrate the bankruptcy practice and are to be condemned.

In setting the fee for current counsel for the trustee, we thus note that they have adequately preserved the assets of this estate and they have brought less than $70,-000 into the estate. Accordingly, fees are to be awarded to Krohn and Helfant based upon an hourly rate of $100, a rate we consider to be a reasonable average for work done in this case, most of which was completed by 1980. The 1,200 hours recorded should be discounted by 5% for the duplication of each other's work and by an additional 5% for the ministerial quality of much of the work completed. Those hours

must be further discounted by 20% for delay which has extended this case unnecessarily and delayed satisfaction of the creditors. Thus, the applicant's request for $180,000 in compensation is denied; a fee of $84,000 is awarded in its stead.

### III

### *The Application for Compensation of Alex Rosen, General Counsel for the Trustee*

Pursuant to an order of this Court, Alex Rosen was appointed as counsel for the trustee on October 25, 1974. As do his successors, Krohn and Helfant, Rosen carries the burden of establishing his entitlement to a reasonable allowance from the assets of the estate. Unlike Krohn and Helfant, however, Rosen has failed to provide this Court with even a summary detailing the time he has expended on this case.[5] It has been held that where there is no itemization of time spent by the attorney for the trustee there can be no fee awarded. *In re Garland*, 8 B.R. 826, 829 (Bankr. D.Mass.1981) Similarly, it has been held that no compensation should be awarded where it is impossible to render an appropriate decision due to the absence of adequate time records. *In re Imperial "400" National, Inc.*, 432 F.2d 232 (3d Cir.1970). In any case, the absence of a detailed account of the time spent by an attorney for the trustee has always been heavily disfavored by courts, *see, In re Hamilton*, 11 B.R. 326, 7 B.C.D. 963, 4 C.B.C.2d 699, 704 (Bankr.E.D.Mich.1981); *Beverly Crest Convalescent Hospital*, 548 F.2d 817, 820 (9th Cir.1976), and this Circuit has specifically requested that such accounts be filed. *In re Hudson & Manhattan R.R.*, 339 F.2d 114, 115 (2d Cir.1964); *see also, Matter of Interstate Stores, Inc.*, 437 F.Supp. 14, 16 (S.D.N.Y.1977). Due to the absence of such records in Rosen's application, the award granted in this case may appear peculiarly arbitrary. But any such arbi-

trariness could be quickly alleviated by the presentation of detailed time records by the professional requesting compensation.

While Krohn and Helfant's work was characterized chiefly by delay, Rosen's work was marked by an almost complete lack of productivity. During the 22 months in which Rosen was counsel to the trustee, he was able to: (a) examine a dozen parties with respect to various aspects of this liquidation, (b) initiate proceedings against United Auto Auctions Systems, Inc. and Kleinberg, Kaplan, Wolff & Cohen and (c) participate in preliminary examinations of parties with respect to arbitration proceedings before the NYSE initiated by J.H. Kern & Co. Rosen was able to complete none of these actions and, consequently, succeeded in bringing no money into the estate in his nearly two years as attorney for the trustee.

Like Krohn and Helfant, Rosen requests a flat rate of $150 per hour for the 255 hours he estimates that he devoted to this proceeding. As we pointed out with regard to Krohn and Helfant, an hourly rate of $150 per hour in 1975 was by no means the standard local hourly fee, especially for matters as routine and uneventful as this. *See, In re Checkmake Stereo and Electronics, Ltd.*, 21 B.R. 402, 6 C.B.C.2d 982, 994 (E.D.N.Y.1982); *Matter of Investors Funding Corp. of New York*, 422 F.Supp. 461, 469 (S.D.N.Y.1976).

Thus, taking into consideration Rosen's lack of productivity in this case and the lack of any detailed time records and the request for an excessive hourly fee, we hereby deny Rosen's request for compensation of $38,500. Instead we award him a fee of $10,200. That sum is adequate compensation for that which Rosen was able to accomplish for the trustee: (a) the preservation of the estate's assets for 22 months and (b) the initiation of several actions which were ultimately resolved in favor of the estate.

---

**5.** The explanation for the absence of time records offered by Rosen is the cryptic notation: "Because of the circumstances necessitating applicant's enforce [sic] retirement, all of the ap-

plicant's time records have been lost and are not presently available." Rosen's application for allowance at 16. The efforts made to preserve those records are not stated.

## IV

### *The Application of Allan Feingertz, Trustee*

 It is the duty of the Trustee to preserve the assets of the estate and to expedite the liquidation and disbursements of those assets. Bankruptcy Act § 47; *Rife v. Ruble,* 107 F.2d 84, 86 (6th Cir. 1939); *see also, 2 Collier on Bankruptcy,* 330.05, 330–26 (15th ed. 1984). The aforementioned failure of Krohn, Helfant and Rosen to expedite this liquidation proceeding are derivative of the failure of their client, the trustee, Allan Feingertz. Accordingly, we hereby reduce Feingertz' requested compensation of $4,000.00 by 40% and award the trustee $2,400 for his efforts in preserving the estate, keeping accurate records and accounts, and filing timely financial reports with this Court.

It is SO ORDERED.