**In the Matter of STABLE MEWS ASSOCIATES, Debtor.**

**Bankruptcy No. 82 B 12454 (HCB).**

United States Bankruptcy Court, S.D. New York.

March 7, 1985.

Albert Togut, New York City, for Trustee.

Luigi P. DeMaio, New York City, for debtor.

Harold Jones, New York City, Asst. U.S. Trustee.

Charles Weintraub, White Plains, N.Y., for R. Fiske Whitney.

Joseph Dornbush, Dornbush, Mensch & Mandelstam, New York City, Defendant in Adversary Proceeding.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

This is a case where an attorney, Albert Togut, acting in the dual capacity of Chapter 11 Trustee and counsel to the trustee has turned a pig's ear into a silk purse and now applies to be paid for the service. He seeks $23,959.96 in trustee's commissions, $142,981.00 in attorneys' time charges, $1,354.80 for reimbursement of out-of-pocket disbursements, and a 15% bonus of $21,-447.15. To this the debtor, through its said attorneys DeMaio and Meglio, and the holders of a second mortgage on the debtor's principal asset have objected. The United States Trustee for this district, upon review of the services performed and fee sought, supports the fee application in full and asserts that the debtor lacks standing to object.

### I.

We turn first to the standing issue. The virtually sole asset of this estate consists of the $2,200,000 in proceeds realized upon the sale of a building located at 412–414 East 75th Street, New York City. At the closing, the Trustee satisfied the first mortgage in the sum of $1,724,916.70 and paid certain capital gains and transfer taxes leaving a balance of $267,862.76. Against this balance, a second mortgage is asserted in the amount of $150,000 plus interest. The debtor disputes this mortgage and the Trustee has commenced an adversary proceeding seeking to have it set aside on the grounds that it was taken in fraud of the debtor's limited partnership. There remains, nevertheless, a priority tax claim asserted by the United States in the sum of $410,000 to which no objection has been filed.

Thus, regardless of the validity of the mortgage, it appears that the debtor is truly disinterested in the amount awarded to Togut as Trustee and/or counsel in this case since the debtor's assets have been liquidated and there is no remaining business with which to fund a possible six year stretch out of tax obligations were that course taken pursuant to § 1129(a)(9)(C) of the Bankruptcy Code. Accordingly, the debtor lacks standing. *In re George*, 23 B.R. 686, 687; 9 B.C.D. 915; 7 C.B.C.2d 846, 847 (Bkrtcy. S.D.Fla.1982). Even had its attorneys been retained by an order of this Court and their objections deemed properly filed, the objection can only be advisory.

### II.

So too must the objection of the second mortgagees be dismissed to the extent it is based on the contention that the fees should be set in such an amount reflecting only the benefit to them. In asserting that Togut's recovery should be so measured, their complaint is not so much with Togut, whom they assert did a "magnificent job" but with the operation of §§ 506(b) and (c) of the Code and their status as second mortgagees. As the second mortgagees seemingly concede, to the extent that a trustee's "reasonable, necessary costs and expenses of preserving, or disposing of" collateral may be charged to

the holder of a secured claim pursuant to § 506(c), "any recovery against the holder of such costs and expenses under Section 506(c) should properly be allowed to the holder, as part of its secured claim under section 506(b) as if the holder had enforced its lien, to the extent of the proceeds available." 3 Collier on Bankruptcy ¶ 506.6 at p. 504–47 (15th ed. 1984). Thus, costs assessable under § 506 are tacked onto a first mortgagee's claim and paid to the detriment of second mortgagees. It would thus be an error to measure the award of fees solely by the benefit perceived by a second mortgagee.

### III.

■ None of this is to say that this Court is thereby relieved from its independent duty of determining whether the fees sought by a trustee and his counsel were reasonable and necessary to preserve and dispose of the property for the benefit of the mortgagees even if the second mortgagee's objection can be read to matter in issue. As to the reasonableness of the fees, that term must be read in the same light as the equivalent term is employed in §§ 326 and 330(a)(1) of the Code, thereby calling for application of the twelve factors set forth in *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1298–99, (5th Cir.1977), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). Those factors are:

(1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The 'undesirability' of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases.

Upon application of certain of these factors, including time and normal charges, a lodestar sum may be fixed. The lodestar amount is meant to be the product of hours compensable under Code § 330 multiplied by the customary hourly wage. Factors regarding the difficulty, complexity and contingent nature of the case may thereafter be employed to arrive at a just and reasonable compensation in excess of the lodestar. *Yermakov v. Fitzsimmons*, 718 F.2d 1465 (9th Cir.1983); *In re Minton Group, Inc.*, 33 B.R. 38 (Bankr.S.D.N.Y. 1983); *In re Chriss*, 38 B.R. 655 (Bank.S.D. N.Y.1984); *In re Watson Seafood & Poultry Co.*, 40 B.R. 436 (Bankr.E.D.N.C.1984); *In re Global Int'l Airways, Corp.*, 38 B.R. 440 (Bankr.W.D.Mo.1984); *In re Penn Dixie Industries, Inc.*, 18 B.R. 834 (Bankr.S.D. N.Y.1982); *In re Aminex Corp.*, 15 B.R. 356 (Bankr.S.D.N.Y.1981).

■ To the factors itemized above is to be added the notion that attorneys' fees may not reflect time performing a trustee's duties. *In re Codesco, Inc.*, 18 B.R. 225 (Bankr.S.D.N.Y., 1982); *In re Minton Group, Inc.*, 33 B.R. 38 (Bankr.S.D.N.Y. 1983); *In re Mabson Lumber Co., Inc.*, 394 F.2d 23 (2d Cir.1968); § 328(b); § 329(b). Similarly, the employment of an attorney as trustee does not require him to contribute his legal skill and services to the estate. *In re York International Bldg., Inc.*, 527 F.2d 1061, 1072 (9th Cir.1975); 2 Collier on Bankruptcy ¶ 330.04, 330–10, 11 (15th ed.) 1984.

As to necessity and benefits, the concepts expressed in *In re Flagstaff*, 739 F.2d 73 (2d Cir.1984) and *In the Matter of Trim-X*, 695 F.2d 296, 7 C.B.C.2d 955 (7th Cir. 1982) apply. In *Flagstaff*, the debtor owed a secured creditor approximatley $22 million which was oversecured by accounts receivable valued at approximately $42 million. In advancing the debtor an additional $9 million pursuant to a financing order, the creditor obtained a super-priority in all present and future property interests. Upon liquidation of the collateral it was found insufficient. In these circumstances, the services of counsel for the debtor and

for the creditors' committee were held not to have benefitted the secured creditor. Although continuation of the proceeding may have facilitated liquidation of the collateral, the court ruled that "such benefits as might be said to have accrued to GECC from the attempt to reorganize were incidental to the reorganization efforts ..." Given the shortfall, the court stated that it would require "rather strained logic to conclude that GECC actually benefitted from appellees' service." 739 F.2d at 76.

In *Trim-X,* the debtor owned certain assets in which a creditor had perfected a security interest. Those assets were appraised at less than that of the security interest. Along with requesting permission to dispose of the assets under § 554, the trustee sought recovery of expenses incurred theretofore in preserving those assets pursuant to § 506(c). The court held that in order to be paid expenses for preserving assets under § 506(c), reasonability, necessity and benefit is to be examined and ruled that all expenses accrued post-petition in the course of abandonment, including appraisal costs and the employment of a security company to protect the assets, as chargeable to the secured creditor. Expenses accrued after the secured creditor received notice of the abandonment, however, would not be charged to him.

### IV.

In the application of those factors, the overall nature of this case is to be examined. Here, when an order directing the appointment of a trustee was entered on June 2, 1983, this case had come to a screeching halt. In the six months since filing its petition, the debtor had neither made progress toward a plan of arrangement nor towards the disposal of the building which was its sole asset. It had not even proceeded to the point of obtaining authorization under § 327(a) of the Code to engage the attorneys who regularly appeared on its behalf. Indeed, the debtor was not even in possession of the building. In connection with a pre-petition foreclosure action brought by the First Mort-

gagee, a receiver had been appointed by the Supreme Court for the State of New York, County of New York and the debtor had made no demand for turnover of the property pursuant to § 542(b) of the Code.

All the Debtor had done was to respond to the First Mortgagee's motion that he be permitted to proceed with a judgment of foreclosure on his mortgage and sale or that the case be dismissed with a motion seeking permission to enter into an agreement selling the property to Highland Associates, Inc. for $1,750,000, subject to the condition that the property be vacated by its eight tenants. Upon the First Mortgagee's objection, the Highland offer was modified from $1,525,000 in cash and a $225,000 purchase money second mortgage to $1,700,000 in cash but subject to the same condition of being vacant. While the motion was granted, the court also had ordered that the First Mortgagee could, upon notice, file an order to dismiss the case. Shortly thereafter, the debtor consented to the appointment of a Chapter 11 trustee.

With the case in this sorry posture, Togut began the process of resuscitating it so at least the various creditors could know that their interests were being protected and any potential for a dividend could be fairly examined. Upon seeking a turnover order, he obtained the building from the receiver. He successfully opposed the First Mortgagee's motion to vacate the automatic stay pursuant to § 362(d) of the Code or to dismiss the bankruptcy case pursuant to § 1112(b) of the Code and the motion was denied without prejudice and with leave to renew. With debtor's counsel, he met with tenants and seeking to pursuade them to vacate the building, explained to them the operation of § 365(h) of the Code. He also obtained from Highland an extension to December 31, 1983, of the July 15, 1983, deadline provided for in the debtor's contract with Highland. He further met with counsel for the debtor and counsel for the First Mortgagee explaining to them the legal strategy he planned to adopt in pursuading the tenants to vacate the building in order to satisfy the condi-

tion to the Highland contract. Thus, within a two month period, Togut brought the case to a posture of potential viability.

In order to realize upon that potential, he thereupon sought to reject the tenants' leases and to charge them for reasonable use and occupancy at market rates, relying on *In re Schnabel*, 612 F.2d 315 (7th Cir. 1980) where such relief was granted. This matter was hotly contested by several tenants who filed numerous affidavits and two briefs in opposition, which were deemed to be a motion to dismiss pursuant to Bankruptcy Rule of Procedure 1017 and Federal Rule of Civil Procedure 12(b)(6). Their opposition caused Togut to file two briefs and sets of supporting papers. In a decision of December 6, 1983, 35 B.R. 603 (Bkrtcy.N. Y.), as implemented by order of January 9, 1984, this Court granted the motion to dismiss insofar as the Trustee sought to charge the opposing tenants rent at a rate in excess of that provided in their leases. From examining that decision, the dearth of authority directly on point and the lengthy inquiry necessary to resolve the issue of whether Congress intended such a result in enacting § 365(h) of the Bankruptcy Reform Act of 1978 are obvious.

Following that decision, the First Mortgagee renewed his motion to vacate the automatic stay or to dismiss. Opposing that renewed effort to doom the case, Togut filed substantial papers and was successful in achieving time to permit the reduction of his motion to reject the tenants' leases and to market the building. This Court, in affording the First Mortgagee with adequate protection and upon his consent, ordered that an auction be held in early October 1984, whereby the building would be sold.

Concurrently, Togut proceeded with his attempt to reject the tenants' leases. An evidentiary hearing was held on March 13, 1984, where the tenants contended that the Trustee lacked adequate business reasons for rejecting their leases and that he could not, under local statutes and 28 U.S.C. § 959, terminate servicing the building. Testimony of various tenants, the First Mortgagee and the managing agent engaged by the Trustee was taken. Briefs and affidavits were submitted. The Court, in its decision of July 11, 1984, 41 B.R. 594 (Bkrtcy.N.Y.), determined that the motion to reject should be granted. Its decision was implemented by a settled order of July 20, 1984.

From that order the tenants appealed and sought a stay, first in this Court and subsequently in the district court. Togut was thus forced to submit papers opposing that relief.

By memorandum decision, this court denied that motion on August 14, 1984. The district court reserved decision on the motion. Yet, following the sale of the building, the tenants abandoned the appeal of the Rejection Order and entered a stipulation dismissing the appeal with the district court.

The negotiations which led to the sale of the building to a company founded by a Lawrence Herbert, began when Togut met with Herbert's employees on May 22, 1984. Further meetings and significant telephone conversations took place from that date until June 29, 1984, when Togut reached a basic sales agreement with Herbert's counsel. Herbert's proposed contract was unique in Herbert's agreement to purchase the building subject to all existing tenancies, something no other buyer, including Highland Associates, Inc., was willing to do.

Negotiations between Togut and Herbert's counsel over the written sales contract were laborious. When the contract was reduced to writing to his satisfaction, Togut prepared all documentation necessary to go forward with the auction. Those papers included a notice of motion to sell the building free of liens with those liens to attach to the proceeds; a complaint in the adversary proceeding against the Second Mortgagee to contest the validity of its second mortgage and an advertisement in the New York Times. That advertisement generated over ninety responses all of which Togut handled. Furthermore, the First Mortgagee requested a hearing on

whether his interests were adequately protected and after this court prompted Togut to reach an agreement, Togut submitted a stipulation to that effect on October 4, 1984, which was approved on October 9, 1984, and amended on November 20, 1984.

At the auction, the bidding was spirited and soon became a contest between Herbert and one Beltremini. Each of Beltremini's bids were subject to receiving the benefits of this Court's order of July 20, 1984. Herbert won out with a high bid of $2,300,-000. Togut recommended acceptance of the bid, which was granted, and took steps to implement the contract with Herbert, including obtaining from New York State a determination of the real property transfer capital gains tax payable by the Trustee by reason of the sale of the building to Herbert. Not until after an order to show cause was entered and a hearing held on October 12, 1984, did the debtor garner the information necessary.

Concerned that a phrase contained in the July 20, 1981 order of this Court could preclude them from exercising alleged renewal rights that might be afforded by state law, the tenants filed a motion on October 19, 1984 seeking modification of that order. Togut prepared an opposing affidavit. The motion was granted on November 2, 1984, and an amendatory order was entered deleting the offending language since this Court had made no determination of the tenants' renewal rights under state law. Togut had inserted the language at the request of Herbert's counsel. Herbert claimed to have relied upon it and, following the hearing, his counsel asserted that a new auction should be held.

Togut resisted Herbert's attempt to undo the auction and engaged in extensive negotiations in order to keep the sale intact. Ultimately, Herbert agreed to buy the building for $2,200,000, one hundred thousand dollars lower than the before agreed upon price, subject to the tenant's possessory rights defined in both § 365(h) of the Code and the court's modified rejection order.

Before closing the sale, Togut was compelled to appear in front of an administrative law judge for having operated a boiler without an operating certificate. He successfully reduced a potential Environmental Control Board fine of an accumulated $24,750 to the statutory minimum of $250. He also managed through his efforts to avoid the cancellation of the building's liability insurance so that he could comply with this Court's November 1984 ruling that the building should be heated so as to avoid freezing pipes and other cold weather damages prior to closing with Herbert. The insurance company refused absent certain expensive repairs which the estate could not pay for to extend the policy's effective date until the date of sale. Togut began an adversary proceeding, preparing a summons, complaint, order to show cause and a temporary restraining order. After the onset of the proceeding, the insurance company agreed to issue replacement liability insurance coverage.

All matters precedent to the sale were cleared up by early November, and Togut prepared a 20 page application and an order to show cause to determine whether the sale to Herbert for $220,000 should be authorized. This court approved the sale and it was closed on December 1, 1984.

## V.

### (i) *Time and Labor Required*

For these services broadly outlined above, Togut seeks attorneys fees as follows:

| | Hours | Rate | Total |
|---|---|---|---|
| Albert Togut | 564.8 | 200 | $112,960 |
| Kenneth Coleman (2nd Year Associate) | 202 | 120 | 24,240 |
| Judith Togut (1st Year Associate) | 86.6 | 60 | 5,196 |
| Joseph Simon (Assoc. Paralegal) | 13 | 45 | 585 |

These hours are supported by time records which we have reviewed finding in large measure the work performed to be attorney's work rather than trustee's work or work that an attorney would have to per-

form in order fully to advise the trustee as to the performance of his obligations as such. Only the following items are chargeable as trustee's time:

| Togut: 1983 | | Time |
|---|---|---|
| July 15 | t/c retention of A.J. Clark | .5* |
| Sept. 1 | payment of insurance policy premium balance | .2 |
| Sept. 20 | advertisement for new tenants | .7 |
| Sept. 28 | " " " " | .1 |
| Nov. 30, Dec. 5 | dealing with complaint regarding heat at building | .6 |
| Dec. 8 | t/c Grabow (A.J. Clark) | .6 |
| Dec. 14 | t/c Mickenberg re insurance | .6 |
| Dec. 14 | t/c Grabow re insurance | .6 |
| 1984 | | |
| Jan. 24 | following leads to possible purchasers** | .4 |
| Feb. 9 | " " " | 1.9 |
| Feb. 17 | t/c w/Mickenberg re insurance | .4 |
| March 2 | following leads to possible purchasers | .7 |
| March 8 | " " | .1 |
| March 21 | " " | .4 |
| March 22 | " " | .3* |
| April 10 | " " | 1.2 |
| April 16 | " " | .8 |
| April 19 | t/c Mickenberg | .4 |
| May 2 | following leads to possible purchasers | 1.1 |
| June 8 | t/c with Boardwin (broker) re statute of building | .2 |
| June 21 | " " | .8 |
| July 27 | termination of services to building | 1.5* |
| Sept. 10 | t/c garbage problem, show building | .8 |
| Sept. 25 | questioning bill for rubbish removal | .3 |
| Oct. 4 | cancellation of insurance | .2 |
| Nov. 8 | " " | .6 |
| Nov. 8 | following lead to possible new buyer | |
| Nov. 20 | t/c Grabow re turning on heat | .6 |
| Nov. 21 | finding new superintendent | .2 |
| | Total | 14.9 |
| Coleman: 1984 | | |
| Feb. 10 | t/w with Grabow | .3* |
| March 3 | following lead to potential purchaser | .3 |
| March 9 | t/c with Grabow | .2 |
| March 12 | " " | .2 |
| | Total | 1.0 |

* Collected with legal time; amount of Trustee's time estimated.

** Togut would be informed of possible purchasers. It is reasonable to assume that an attorney would be called in to assist a trustee once sufficient interest was shown that the purchaser was identified and a meeting set up. That time is to be accounted for as attorney's time. Time prior to that should be reflected as trustee's time.

While these hours may seem low, that is undoubtedly because Togut wore both hats. Had a separate Trustee hired Togut to serve as his attorney, Togut's attorney time would not be reduced. Rather, the Trustee's time would rise dramatically reflecting meetings with counsel, visits to court when counsel appeared and other indicia of a prudent client consulting with his attorney. Indeed, it is safe to say that had the Trusteeship and counsel not been combined in one person, Togut's attorney time would be considerably greater than it is. He would have had to meet with his client, plan strategy, keep the Trustee informed and be the recipient of repeated communications from the Trustee keeping him informed so that he could render advice, represent the Trustee and prepare legal documents when the need arose.

■ We thus conclude that Togut spent 549.9 hours attorney's time, Coleman spent 201 hours and that the time of Judith Togut and Joseph Simon is properly reflected as attorney's time. Not only does this conclusion reflect the demarcation footnoted above, it also reflects including as attorneys time the approximately five hours Togut spent in keeping the property insured upon this Court's direction that the heat be turned on so as to prevent deterioration of the property after the auction. Any client would have had his attorney assist him in that crisis. An attorney's role is not just to appear in court; it is to advise and assist his client, when called upon, in all matters touching upon the law and in complying with court orders, particularly in a crisis. That time is properly recorded as attorney's time.

### (ii)–(iii) *Novelty and Difficulty of the Questions and Requisite Skill*

By far the bulk of the time reflected in the records of Togut's firm is devoted to the legal work regarding the matters reflected in this Court's decisions of December 6, 1983, and July 11, 1984. The novelty and difficulty of the issues there addressed is fully reflected in those decisions and need not be discussed again here. The considerable skill Togut brought to these issues is reflected in the papers he submitted and the transcripts of hearings before this court. Suffice it to say that Togut litigated hard and well regarding issues not resolved by case authority under the Bankruptcy Code.

Further, the difficulty in implementing this Court's decision of July 11, 1984, and the controversy concerning its order of July 20, 1984 all support the time and fees sought.

### (iv)–(v) *Preclusion of other Employment and the Customary Fee*

■ For these reasons, perhaps, there is no dispute that Togut and his staff would have handled other matters for which they would be paid, if not for these matters. For those he would charge the same $200/hour rate for himself and $120/hour rate for Coleman. While there can be no doubt that such fees exceed the rates customarily charged in a case under the former Bankruptcy Act for advising a trustee in the administration of an estate, *In re Ferkauf, Inc.,* 42 B.R. 852, 857 (S.D.N.Y. 1984), that excess does not make them improper *per se* for two principal reasons. Section 330(a) of the Bankruptcy Code struck the notion that fees to trustee's counsel are to be awarded on the basis of economy, *see First Colonial,* 544 F.2d at 1299, and replaced it with the concept that attorneys may charge for that work the same fees they receive for similar work. The rates requested here reflect that standard. Indeed, Togut's fees are largely based on conducting a difficult litigation of far different magnitude than advising a trustee on compliance with the Bankruptcy Code and other applicable laws. One cannot demand of an attorney that he litigate fully and then award fees on the basis that he should have been more sparing in his efforts.

### (vi)–(vii) *The Contingent Nature of the Engagement and Time Limits Involved*

The fees for that litigation, indeed for all of Togut's efforts, were necessarily contin-

gent. Were the property were sold at a sum less than outstanding mortgages, his fees would be contingent upon and measured by the benefit received by secured creditors under § 506(c). Moreover, by virtue of the order resolving the First Mortgagee's renewed motion to dismiss whereby the property was to be auctioned in early October 1984, Togut had to achieve that benefit through concluding the litigation process and through generating sufficient interest in the property and establishing a floor selling price within five months.

### (viii) *The Amount Involved and Results Obtained*

In that endeavor he was highly successful. Upon being permitted to reject the tenants' leases in July 1984, he entered into an agreement with Herbert whereby Herbert would be able to purchase the property for $1,800,000 subject to higher and better bids. That a successful conclusion to his litigation with the tenants was necessary to his endeavor is beyond cavil. Togut's time sheets amply demonstrate that although there was interest in the property in the first six months of 1984, no prospective purchaser was willing to commit himself to purchase the property in a non-vacant condition until after this Court's decision of July 11, 1984, held that Togut could reject the leases. This causative effect was further apparent at the auction itself. There, Beltremini, the competing bidder, expressly subjected her bid to obtaining the full benefit of the order implementing the Court's decision.

Moreover, the results gained here are remarkable. Prior to the commencement of Togut's efforts, it was doubtful that the First Mortgagee could have received full payment and virtually certain that the Second Mortgagees would have received nothing. The Highland bid of $1,700,000 would have paid the First Mortgagee in full and contributed something to the Second Mortgagees, but it was subject to an impossible condition. Selling the building prior to the auction in a non-vacant condition would have generated considerably less revenue

than Herbert's final bid, particularly if it had been sold upon foreclosure.

### (ix), (xii) *Attorney Qualifications, Awards in Similar Cases*

■ Although an attorney of Togut's age would normally command a fee of less than $200/hr, he has been previously awarded a fee at that rate. Whether that fee was set over objection is not revealed by the papers before us. The day has come when a fee of $200/hr for attorneys of long standing is not unusual in bankruptcy cases. But such awards are unusual for an attorney such as Togut who has been admitted before the Bar for approximately 10 years. A more customary charge is $175–$180/hr. More questionable is the charge of $120/hr. for Coleman, a second-year associate. That rate is excessive and should be reduced to $100/hr, a standard charge for attorneys of that vintage.

### (x) *Undesirability of the Case*

The substantial conditions that Togut had to satisfy before becoming entitled to a fee under § 506(c), the novelty of the legal questions involved, the litigiousness of the tenants and the debtor's apparent inability to address the needs of this bankruptcy case made Togut's appointment undesirable in every sense except to those who relish in taking on difficult tasks with little hope of remuneration. These factors bespeak not only of the reasonableness of the fees sought, as adjusted in the manner set forth above, but also of the reasonableness of the request for a bonus. This case was exceptional in that it required not just legal skill but also perserverance and hard work in the face of dogged opposition. Togut, nevertheless, achieved full recovery for the first mortgagee and a benefit for the Second Mortgagee. That he should receive a bonus in these circumstances is hardly untoward.

### VI.

Having considered the reasonableness of Togut's fee, we thus turn to the remaining

criteria required by § 506(c): necessity and benefit. As to these, there appears little dispute among the parties whose financial interests are affected. The First Mortgagee has stipulated, *inter alia,* to having been benefitted in the amount of $150,000. Nor do we understand the Second Mortgagees to claim a lack of benefit. At the hearing, their counsel, upon being informed that the Highland bid contemplated no recovery by them, effectively conceded that Togut's work had inured to their benefit. In view of the stark reality of this case, no other conclusion could be reached upon review of the legal tasks that Togut performed.

Principal among these is the litigation with the tenants who were adamantly unwilling to accept a proposal by Togut and the debtor that they relinquish their leases in exchange for $175,000. Although the debtor complains that Togut should have terminated the litigation upon failing in his attempt to charge the tenants for use and occupancy at market rates exceeding the rates provided in their leases, it cannot be gainsaid that the competing bidder at the auction expressly relied on the terms of the July 20, 1984 order granting the motion to reject those leases and that the successful bidder claimed to rely on that order. Secondly, had the debtor at the time truly believed that Togut, in conducting the litigation, merely sought to line his own pocket, it should have moved to terminate the trusteeship pursuant to § 1105 of the Code or to remove Togut as trustee pursuant to § 324 of the Code. It did neither but merely wrote a letter to the court requesting a conference, apparently *ex parte,* a request this court could not and would not honor. That the results of the litigation were instrumental to the auction is sufficient proof of its necessity and of the benefit it rendered.

Also necessary and beneficial to the secured creditors were Togut's actions in maintaining the building and preserving the opportunity to sell it at a price exceeding that of the first mortgage. These include investigating the performance of the managing agent previously engaged by the receiver, engaging the agent to work for the trustee, handling the insurance questions that arose (especially after being directed to heat the building in November 1984 in order to preserve the sale), extending the Highland offer, addressing the complaint before the New York City Loft Board and Environmental Control Board, and his efforts to obtain the debtor's cooperation in furnishing information necessary to completion of the sale.

In particular, Togut's efforts to forestall and to come to an accomodation with the First Mortgagee were necessary and beneficial. Neither the Second Mortgagees nor the debtor assert that, had the First Mortgagee been permitted to proceed with a foreclosure sale, the sum received would have exceeded the First Mortgage. Indeed, the First Mortgagee concurs.

Similarly, the need to confront the continued efforts by the tenants to modify the order of July 20, 1984, and the consequent need to save the sale of the building through renegotiation with the purchaser cannot be doubted. While Togut may perhaps be criticized for having acceded to the request that the order contain language interpretable as terminating the tenant's estates upon their leases' expiration date and thus disregarding their alleged state law renewal rights, such criticism largely rests on hindsight. The point remains that the July 20, 1984, order was the basis for the bidding and that Togut saved the sale at the end.

Similarly, Togut's efforts in negotiating a floor bid and encouraging further inquiries and bids are not to be faulted. Floor bids at the auction generate increased interest in submitting realistic bids. The debtor's claim that it is responsible for interest in the property in September 1984 is belied by the paucity of results it achieved during its custody of this case.

■ The same cannot be said, however, with respect to Togut's investigation of and commencement of an action challenging the validity of the Second Mortgage. While such investigation would be required had

Togut sought to sell the property pursuant to § 363(f) of the Code over the objection of the Second Mortgagees, no such objection was made. Indeed, their counsel was present at the auction and did not then object to the sale. Like the liquidation of accounts receivable which caused a short-fall to the secured creditor and did not consequently benefit that secured creditor in *Flagstaff*, it is hard to see how a challenge to the Second Mortgage could benefit the holders of that mortgage. Togut's fees should, accordingly, be adjusted to delete time spent in that endeavor.*

But the presence of counsel and his implied consent speaks strongly in finding that they recognize the benefit that Togut gained throughout auctioning the property and the necessity of the various steps he took in achieving that result. *Matter of Trim-X*, 695 F.2d at 301.

### VII.

■ We thus conclude that lodestar attorneys fees are to be calculated pursuant to § 506 as follows:

| | Hours | Rate | Charge |
|---|---|---|---|
| Albert Togut | 535.9 | 180 | $ 96,462 |
| Kenneth Coleman | 197.3 | 100 | 19,730 |
| Judith Togut | 86.6 | 60 | 5,196 |
| Joseph Simon | 13 | 45 | 585 |
| | | | $121,973 |

That calculation does not reflect trustee's time as indicated above or the time spent with regard to challenging the second mortgage. To that lodestar sum is to be added a further amount of 13% representing the extremely contingent nature of the fees and the exceptional performance and result achieved, thus resulting in total fees of $137,829.40 and $1,354.80 in expenses which are reasonable and to be awarded in full. In light of the circumstances of this case, those fees are reasonable, necessary and are within the benefit given to the Secured Creditors.

■ The commissions Togut seeks as trustee are within the limits imposed by

§ 326 of the Code. While § 506(c) does not expressly refer to commissions, the phrase "costs and expenses of preserving, or disposing of," collateral would seemingly contemplate payment of commissions. No trustee is expected to work for free. His fee for the service is a cost which a secured creditor should bear if reasonable, and necessary, "to the extent of any benefit." That standard is met here to the same degree as Togut's legal services. The charge is proper; it is to be paid.

It is thus ordered that Togut the sum of $137,829.49 in fees, $1,354.80 in expenses and $23,959.96 in commissions, a total of $163,144.25.

IT IS SO ORDERED.

---

* From reviewing the time sheets, we calculate that time to be 14 hours for Togut and 4.70 hours for Coleman. Excluding this time on this

motion is without prejudice to including it in subsequent request if the estate were sufficient to afford a dividend to unsecured creditors.